628 So.2d 954 (1992)
Robert Lance CORAL
v.
STATE.
CR-89-1117.
Court of Criminal Appeals of Alabama.
March 27, 1992.
*957 W. Terry Travis, Montgomery, for appellant.
James H. Evans, Atty. Gen., and Beth Jackson Hughes and Sandra J. Stewart, Asst. Attys. Gen., for appellee on return to remand.

On Return to Remand
PATTERSON, Presiding Judge.
On original submission, we remanded this case to the trial court with instructions to comply with §§ 13A-5-47 through -52, Code of Alabama 1975, by entering specific written findings concerning the existence or nonexistence of aggravating and mitigating circumstances and, once again, to decide the appropriate punishment by reweighing the proper aggravating circumstances against any proper mitigating circumstances. Coral v. State, 585 So.2d 248 (Ala.Cr.App.1991). We also instructed the trial court to enter written findings of fact summarizing the facts of the crime and Robert Lance Coral's participation in it. These findings by the trial court are essential for us to properly review its sentencing decision. We deferred addressing the other issues raised on appeal, pending compliance with our directions on remand.
In response to our remand, the trial court has filed a new sentencing order with findings. We will now address the issues raised by the appellant on appeal. We will address them in the order in which they are presented in his brief, when possible.
As we have previously stated in our opinion of May 31, 1991, the appellant was indicted on March 7, 1988, in Montgomery County, in a two-count indictment for the capital offenses of murder committed during a robbery in the first degree, in violation of § 13A-5-40(a)(2) (Count I), and of murder committed during a burglary in the first degree, in violation of § 13A-5-40(a)(4) (Count II). The indictment reads, in pertinent part, as follows:
"COUNT I: The Grand Jury of said County charge that before the finding of this indictment ROBERT LANCE CORAL ... did intentionally cause the death of Nancy Burt, by shooting her with a handgun and he caused her death during the time that he was in the course of committing a theft of lawful currency and/or coinage of the United States, of some value, and a wallet, of some value, better descriptions of which are unknown to the Grand Jury, the property of Nancy Burt, by the use of force against the person of Nancy Burt, with intent to overcome her physical resistance or physical power of resistance, while Robert Lance Coral ... was armed with a deadly weapon, a handgun, or caused serious physical injury to Nancy Burt, in violation of Section 13A-5-40 of the Code of Alabama....

*958 "COUNT II: The Grand Jury of said County further charge that, before the finding of this indictment, ROBERT LANCE CORAL ... did intentionally cause the death of Nancy Burt by shooting her with a handgun and he caused her death during the time that he knowingly and unlawfully entered or remained unlawfully in the dwelling of Nancy Burt with intent to commit the crime of Robbery I and/or Theft of Property, therein, and while effecting entry or while in the dwelling or in immediate flight therefrom, Robert Lance Coral ... was armed with a deadly weapon, a handgun or caused serious physical injury to Nancy Burt, in violation of Section 13A-5-40 of the Code of Alabama...."
At arraignment, the appellant pleaded not guilty and not guilty by reason of mental disease or defect. On September 23, 1989, a jury found him guilty of the lesser included offense of murder (§ 13A-6-2(a)(1)) under Count I of the indictment and guilty of the capital offense of murder committed during a burglary in the first degree as charged in Count II (§ 13A-5-40(a)(4)). After a sentencing hearing was held before the jury in accordance with §§ 13A-5-43 through -46, the jury returned an advisory verdict, by a majority vote of eight to four, recommending a sentence of life imprisonment without parole for the conviction of the capital offense charged in Count II of the indictment. See § 13A-5-46(f) (providing, in part, that "an advisory verdict recommending a sentence of life imprisonment without parole must be based on a vote of a majority of the jurors"). Thereafter, the trial court held another sentencing hearing in accordance with §§ 13A-5-47 through -52, and sentenced the appellant to death.

I.
The appellant contends that he was twice put in jeopardy for the same offense because he was convicted of the lesser included offense of murder under Count I, which alleged the capital offense of murder-robbery, and he was also convicted of the capital offense of murder-burglary under Count II. It is clear that these two offenses arose out of the same conduct and that his murder conviction constitutes a conviction for the same murder that was an element of the capital offense of murder-burglary for which he was also convicted. While the appellant was in fact sentenced only for the greater offense, his murder conviction under Count I cannot stand. Section § 13A-1-8(b) provides, in part, as follows:
"When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if:
"(1) One offense is included in the other, as defined in section § 13A-1-9...."
Clearly, under § 13A-1-9, murder is included in the capital offense of murder-burglary. See also Meyer v. State, 575 So.2d 1212 (Ala.Cr.App.1990), for discussion of double jeopardy principles. Accordingly, this cause is remanded for the trial court to vacate the appellant's conviction for murder under Count I of the indictment. However, the appellant's conviction for the capital offense of murder-burglary was proper in this regard and thus it stands.

II-A.
The appellant contends that the evidence presented by the state was insufficient to support the conviction of murder during a first degree burglary. He preserved this issue for review in motions for judgment of acquittal made at the close of the state's case-in-chief and again at the close of the trial after all the evidence had been presented and in a motion for a new trial.
The state's evidence disclosed that, on September 19, 1987, at approximately 4:15 a.m., the body of Nancy Burt (hereinafter referred to as "the victim") was discovered by her live-in boyfriend in her apartment located in the Red Lion Apartments in Montgomery, Alabama. The body was fully clothed, and the victim was wearing jewelry, including a wrist watch, gold rings, necklaces, and "wrist chains"; however, the victim's pantyhose and undergarments had been pulled down to her knees, and her dress had been pulled up, *959 exposing her genitalia. There was no scientific evidence indicating a sexual assault. A further examination of her body revealed that she had been severely beaten about the face, that her nose was broken, that there were bruises and fingernail marks on her neck indicating that an attempt had been made to strangle her, and that she had suffered a contact gunshot wound to her head. The wounds on her face were consistent with having been beaten with the butt of a pistol. The evidence at the scene showed that the killer had placed a pillow over the pistol to muffle the shot when it was fired. The cause of death was the gunshot to her head, and death was apparently instantaneous.
The evidence at the scene indicated that the victim was first attacked in the bedroom and that the struggle continued until the victim was killed in the hallway. Blood was splattered about in the victim's bedroom, in the hallway where the body was found, and in the vicinity of the dining room table. The blood type of some blood under one of the victim's fingernails could not be determined because of the insufficiency of the amount. Blood that was found on the patio breezeway of the victim's apartment was determined to be type ABO Group 0, secretor H. A saliva sample taken from the appellant disclosed an H-secretor substance; however, the appellant's blood type was apparently not determined. The victim and her live-in boyfriend had the same blood type, which was ABO Group A.
When the victim's body was found, the front door of her apartment was locked from the inside by a dead-bolt lock; however, the sliding patio door was unlocked. There were scratch marks on the patio door around the latch. The victim's open purse was sitting on an ice chest in the kitchen; her checkbook was lying nearby on the kitchen floor near the trash can; deposit slips and coins of small denominations were scattered about on the kitchen floor; and her wallet, where she usually kept her driver's license, credit cards, and money, was missing. She had received payment from her employer earlier on the date of her death; however, no currency was found in the apartment.
The state's firearms expert concluded that the victim had been killed by a bullet from a.32 caliber pistol, fired by a Smith and Wesson, Harrington and Richardson, or Iver Johnson "breakdown in the middle type" revolver. In his opinion, the powder marks on the pillow used by the killer to muffle the sound of the pistol shot supported his conclusion that the murder weapon was a short-barrelled.32 caliber revolver.
Earlier on the night of her murder, the victim and her boyfriend had attended a cookout at the residence of her boyfriend's brother, where they had eaten hamburgers. The victim had arrived at the cookout between 6:15 and 6:30 p.m. After eating, she left the cookout alone between 8:15 to 8:30 p.m. and apparently drove directly to her apartment. The autopsy revealed approximately one-half cup of undigested hamburger meat in her stomach. The pathologist testified that the stomach would have been completely emptied through the digestive process within two hours after eating, concluding that the victim had been killed "well within" two hours after she had eaten.
The appellant, an automobile mechanic, was a resident of Galatia, Illinois, where he operated a garage. For several years, he had lived with Abbie Somers, with whom he had had a child named Bobby. In May 1987, they became estranged, and Abbie and Bobby moved from Galatia, Illinois, to Montgomery, Alabama. Upon arriving in Montgomery, they moved into an apartment in the Red Lion Apartments with her sister, Debbie Lauritsen. This apartment was directly above the victim's apartment. On four or five occasions between May and August 1987, the appellant visited Abbie and Bobby at the apartment, and would remain from two days to a week each time. During these visits, he became acquainted with the victim.
In early September 1987, the appellant became involved in a dispute with Abbie over the custody of Bobby, was arrested on a harassment charge, and was incarcerated in the Montgomery municipal jail. During his incarceration, the appellant told fellow inmate Robert Wyatt that he had a .32 caliber pistol hidden in his automobile. Sometime between September 11 and September 18, *960 the appellant also told fellow inmate Jerome Hamilton that he had a .32 caliber pistol in his automobile; that he planned to rob a store on Narrow Lane Road when he got out of jail to get money to pay his expenses back to Illinois; that he had been in the store and had seen the "lady" counting money; and that if he had to kill her he would. The appellant was released from jail on the morning of the murder, September 18, 1987.
Upon his release, the appellant telephoned Abbie Somers from the jail. She drove to the jail, picked him up between 9:30 and 10:00 a.m., and drove him to the municipal automobile lot to get his automobile, which had been seized and impounded when he had been arrested. The appellant told Abbie that he had no money, and she paid the impoundment charges of "over $100.00," so that he could obtain his automobile, a black "Trans Am." After picking up his automobile between 11:30 a.m. and noon, he and Abbie had lunch at a nearby restaurant. She paid for the lunch. The appellant told Abbie that he needed money to get home to Illinois, and she gave him between $30 and $35. He told her that he was going out for drinks with some people he had met, and he left. When Abbie returned to her apartment around 2:00 p.m., she received a telephone call from the appellant, and they discussed visitation rights concerning Bobby. He told her again that he was going home to Illinois. Around 4:30 p.m. that day, Jerome Hamilton, who had also been released from jail that day, received a telephone call from the appellant. The appellant told him that he did not need money because his girlfriend had gotten his automobile out of impoundment. He also said that he was "coming by" for a visit, but he never showed up.
That night at approximately 9:10 to 9:20, the murder-burglary most likely occurred.
Francis Browne, who knew the appellant well, saw the appellant in the parking lot of the Food World grocery store on Narrow Lane Road about one mile from the Red Lion Apartments between 9:10 and 9:20 on the night of the crime. He was driving out of the parking lot in his black Trans Am automobile and was traveling away from the apartments. At trial, Browne was positive about her identification. The following day, September 19, around 10:00 a.m., Abbie called the residence of her father in Galatia, Illinois, to see if the appellant had arrived. She talked with the appellant himself, and he said that he had arrived around 6:00 or 7:00 a.m. According to Abbie, the trip was ordinarily an eight- or nine-hour drive, but could be made in seven hours. Abbie also testified that the appellant owned a gun and that he kept it in his automobile.
The appellant's black Trans Am automobile was discovered in a rural wooded area near Galatia, Illinois, on September 24, 1987. On the ground beside the driver's door there appeared to be a burned plastic substance.
Subsequently, William Braden, a friend of the appellant who lived in Galatia and who had once been his landlord, after learning that the police were looking for the appellant, observed the appellant hiding in the woods near his home. Braden reported this to the police. Before the police arrived, the appellant came out of the woods; Braden told the appellant that the police were looking for him; and Braden asked the appellant, "Bob, did you do it?" and the appellant said, "[Y]es, I did it." Braden asked the appellant "Why?" and the appellant said that "he was in robbing her, she came home before he expected her to, she had too much on him and ... [he] had to shoot the bitch." He told the appellant that he had informed the police that the appellant owned a .32 caliber pistol, and the appellant said, "[D]amn it. What did you tell [them] that for?" The appellant further said that "they would never find the gun," and that the burned substance on the ground beside his automobile was the styrofoam from the shells for the .32 caliber pistol. Then the appellant borrowed Braden's flashlight and told him he had to go out into the woods and find "two things." He told Braden not to look out the window because he already knew too much. On the day after he was arrested for the victim's murder, the appellant called Braden and said "[B]uddy,... you the only one that can send me to the electric chair." Braden told the appellant, "[N]aw, I'm not.... I didn't kill that girl, you did." The appellant responded, "Well, I don't remember telling you that." Braden *961 did not report these conversations with the appellant for six weeks. At trial, he gave the following explanation for not doing so:
"Because the night that he told me he'd killed the lady here in Montgomery, he asked me not to do anything until he had time to run and think about it and when he got it thought out he would either turn hisself [sic] in to Alabama or he would come down here and turn hisself [sic] in."
After the appellant's arrest, Braden looked in the appellant's black Trans Am automobile and there he found the holster for the .32 caliber pistol; he recognized it as the same holster that was with the pistol when the appellant had previously pawned it to him. He gave the police the holster, and it was subsequently introduced into evidence at the trial.
D.T. Marshall of the Montgomery Police Department questioned the appellant in Chicago on October 7, 1987. The appellant told him that he left Montgomery to return to Illinois between 2:00 and 3:00 p.m., September 18, 1987. The appellant admitted to Marshall that he had owned a .44 caliber revolver and a .22 caliber revolver, but he denied that he had ever owned a .32 caliber pistol. He further stated to Marshall that he had pawned the .22 caliber pistol to Braden, and that he had later sold it to an unknown black person. He denied having a pistol while in Alabama.
On November 6, 1987, Kenneth H. Clore of the Illinois State Police talked with the appellant in Illinois. The appellant told him that he left Montgomery, Alabama, on September 18, 1987, around 3:00 p.m.; that the only gun he ever possessed was a .22 caliber pistol; and that he had once pawned it to William Braden, and later sold it to an unknown black person.
The appellant did not testify at either the guilt or sentencing phases of his trial; however, he assisted his counsel in arguing his case during the sentencing phase before the jury. While he asked the jury and the court in his arguments to spare his life, the bulk of his argument did not address matters in mitigation, but were arguments concerning the sufficiency of the state's evidence and assertions of innocence.
The theory of the appellant's defense is that he could not have committed the crime because he was not in Montgomery when the crime was committed. He attempted to establish that he left Montgomery at 3:00 p.m. on September 18, 1987, and that the crime was committed around 8:30 or 9:00 p.m. He attempted, through his witnesses, to establish an alibi and to cast doubt upon the testimony of the state's witnesses, particularly Browne, who had placed him near the crime scene around the time that the crime was committed. He attempted to cast suspicion upon the victim's boyfriend, Tracy Headley, as being the likely killer by trying to show that Headley had a motive and an opportunity to commit the crime, and that he was a person of bad character with a reputation for violence.
Carl Somers, the father of Abbie Somers, testified for the defense. He stated that the appellant came to his home in Galatia, Illinois, about 7:00 a.m., September 19, 1987; that he did not notice any blood or scratches on him; that the appellant washed a shirt and a pair of blue jeans in his washing machine shortly after arriving; and that, on a shopping trip with the appellant on September 19 or 20, he saw the appellant buy and pay for a pair of boots and a helmet. The shirt and blue jeans were subsequently tested for blood, and none was found.
Janet Vines, testifying for the defense, stated that she lived at the Red Lion Apartments; that at 7:30 p.m. and again between 9:00 and 9:30 on September 18 she looked in the parking lot where the victim usually parked her automobile and she did not see the victim's automobile; and that she looked in the lot at 10:00 p.m. and saw the automobile parked in its usual place.
Several witnesses called by the defense testified that Braden and Headley had bad general reputations, and that Headley had a bad general reputation as to truthfulness and violence. Karen Amerson testified that the victim was in love with another man and that she had told her that she wanted to terminate her relationship with Headley.
The state countered this testimony by presenting evidence showing that Headley had *962 spent the evening with friends. Headley testified that shortly after the victim left his brother's residence he joined some friends at a nightclub and remained with them until around 4:00 a.m., when he went to the victim's apartment and discovered the body. Several witnesses presented by the state supported Headley's testimony.
A seven-year-old boy who was in a "special age" class and who the record indicates may be "retarded" to some unknown extent, was called as a witness with the consent of the parties. Early in the investigation of the crime, the police learned that a child had been playing in the area of the victim's apartment on the night of the killing, and that he had told his father that he had seen something. The police took a statement from the child, wherein he stated that at about 9:00 p.m. he observed the victim, whom he knew, arrive in a black automobile at her apartment and go inside; that she was followed by a white man who had gotten out of a white automobile; that the man had a gun; that the man went to the victim's door and kicked it; that the man pushed his way inside; that shortly thereafter he heard a gunshot; and that the man then came out of the apartment. Defense counsel questioned the child on direct examination mostly by leading questions, and his testimony substantially coincided with the statement that he had previously given the police. On cross-examination, the prosecutor asked the child if he saw in the courtroom the man who had had the gun at the victim's apartment on the night of the murder and if he did to point him out, and the boy pointed to the appellant. The witness was acquainted with the appellant, had seen him previously at the Red Lion Apartments, and had played with Bobby, his son.
The father of the child, upon questioning by defense counsel, testified about what his son related to him on the morning following the killing. He stated that, while his son was outside playing on the night of the killing, the father heard a "popping" noise between 9:15 and 9:30, but that he thought that the noise was firecrackers. On cross-examination by the prosecutor, he stated that he had questioned his son about the color of the skin of the man his son saw on the night of the killing, and that his son told him that the man was neither black nor white, but was brown. The record shows that the appellant is of black and Hispanic ancestry and that he has a "light" complexion. He also testified that his son had told him, when they went to the police station, that the man he saw with the gun was the appellant, Robert Coral.
In deciding whether there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, the evidence must be reviewed in the light most favorable to the prosecution. Faircloth v. State, 471 So.2d 485 (Ala.Cr.App.1984), aff'd, 471 So.2d 493 (Ala.1985); Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979). "Conflicting evidence presents a jury question not subject to review on appeal, provided the state's evidence establishes a prima facie case." Newsome v. State, 570 So.2d 703, 710 (Ala.Cr. App.1989).
"The action of the trial court in denying a motion for judgment of acquittal must be reviewed by determining whether there exists legal evidence before the jury, at the time the motion is made, from which the jury by fair inference could find the defendant guilty beyond a reasonable doubt."
Id. (citations omitted). See also Willis v. State, 447 So.2d 199, 201 (Ala.Cr.App.1983).
In the instant case, we have examined the evidence presented by the state and, in so doing, have applied the standards of review set out above. The state's evidence is both direct and circumstantial. While there is practically no scientific evidence linking the appellant to the crime scene, there is considerable circumstantial evidence linking him to the crime; and, of course, he admitted committing the crime.
To summarize the evidence introduced prior to the first motion testing the sufficiency of the evidence: The appellant was released from jail earlier on the day that the crime was committed; he had expressed an intent to rob someone because he needed money; he had stated that he would kill if necessary in carrying out a robbery; he told his girlfriend that he had no money, and she paid *963 his automobile impoundment fee, bought him lunch, and gave him from $30 to $35 for expenses on his trip home to Galatia, Illinois; he had stated that he had a .32 caliber pistol hidden in his automobile; at 4:30 p.m., he telephoned an acquaintance he had met in jail and said he was "coming by"; he was observed near the scene of the crime between 9:10 and 9:20 p.m., which was around the time the crime was committed; and he was familiar with the apartment where the victim lived. After his arrest, he told the officers that he had left Montgomery around 2:00 to 3:00 p.m. on the day of the crime, that he had arrived in Galatia around 6:00 to 7:00 a.m. the following day, and that he had stopped and rested along the way. However, it is reasonable to infer from the evidence that had the appellant left Montgomery as late as 10:00 p.m., he could have driven to Galatia by 7:00 a.m. The appellant also told the officer that he had never owned a .32 caliber pistol; however, two fellow inmates in the Montgomery jail testified that he told them that he had a .32 caliber pistol hidden in his automobile, and a friend and prior landlord of the appellant's testified that he had received a .32 caliber pistol from the appellant as security for a loan some time prior to the killing. The fact that the pistol was a Smith and Wesson .32 caliber "breakdown in the middle" type was verified by a gun collector who observed it, and the holster for the pistol was found in the appellant's automobile. Finally, the appellant admitted to his friend and former landlord that he had killed the victim to prevent her from identifying him when she surprised him while he was burglarizing her apartment. He made other incriminating statements to his friend, which are set out above in detail, and there was also evidence of flight and of destruction of evidence. A small amount of blood was found on the patio breezeway of the apartment, which was determined to be type ABO Group 0, secretor H, and an H secretor substance was found in the appellant's saliva. The victim was killed by a .32 caliber "breakdown in the middle" type pistol, possibly a Smith and Wesson, and her wallet, which contained her credit cards and money, was missing. There was some evidence of forced entry to the patio door of the apartment, and the scene inside indicated a brutal struggle and a hasty rifling of the victim's purse and personal belongings.
We conclude that the evidence presented by the state in its case-in-chief was sufficient to establish a prima facie case of murder during a robbery and of murder during a burglary, as charged in the indictment. We further conclude that the evidence presented was sufficient, in our opinion, for the jury to find the appellant guilty of murder-burglary beyond a reasonable doubt. The trial court's denial of the appellant's motion for a judgment of acquittal made at the conclusion of the state's case-in-chief was correct. The case was properly submitted to the jury. Thus, we further conclude that the denial of the appellant's motion for a judgment of acquittal made at the conclusion of the presentation of all the evidence and the denial of his motion for a new trial based upon alleged insufficiency of the evidence to support the convictions were proper.

II-B.
The appellant contends that the trial court improperly failed to charge the jury on the lesser included offenses of felony-murder, burglary, manslaughter, and criminally negligent homicide, § 13A-6-2(a)(3); § 13A-7-5, -6, and -7; § 13A-6-3; and § 13A-6-4, Code of Alabama 1975, respectively. Section 13A-5-41 provides as follows:
"Subject to the provisions of section 13A-1-9(b), the jury may find a defendant indicted for a crime defined in section 13A-5-40(a) not guilty of the capital offense but guilty of a lesser included offense or offenses. Lesser included offenses shall be defined as provided in section 13A-1-9(a), and when there is a rational basis for such a verdict, include but are not limited to, murder as defined in section 13A-6-2(a), and the accompanying other felony, if any, in the provision of section 13A-5-40(a) upon which the indictment is based."
Section 13A-1-9(b) provides: "The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense."
*964 We conclude that the trial court properly refused to instruct the jury on felony-murder, burglary, manslaughter, and criminally negligent homicide. There is no rational basis under the facts of the instant case for a verdict convicting the appellant of any of these offenses. No factual basis or reasonable theory from the evidence exists to support the giving of any of those instructions. See Ex parte Hannah, 527 So.2d 675 (Ala. 1988); Jones v. State, 514 So.2d 1060 (Ala.Cr. App.), cert. denied, 514 So.2d 1068 (Ala.1987). We note that the trial court properly instructed the jury on the lesser included offense of murder under § 13A-6-2(a)(1) as to both counts of the indictment.
The appellant further contends that the trial court erred in refusing to give his requested written instructions 28, 29, 30, 39, 46, 55, and 61. Charges 28, 29, and 30 are requests for instructions on felony murder, manslaughter, and criminally negligent homicide, respectively. For the reasons stated above, we find no error in the court's refusal to give those charges. Charges 39, 46, 55, and 61, concerning the burden of proof, the presumption of innocence, credibility of witnesses, and weight to be given a witness's testimony, respectively, were fairly and substantially covered in the trial court's oral charge; thus, no error occurred in the refusal to give those requested charges. See Ex parte Wilhite, 485 So.2d 787 (Ala.1986). In addition, the trial court also properly refused to give charge 61, concerning the effect of a felony conviction on a witness's credibility, because the record failed to disclose that any of the witnesses had a felony conviction.

III-A.
The appellant contends that the indictment under which he was charged should have been dismissed because, he argues, no legal evidence was presented to the grand jury to support it. He raised this contention by a pretrial motion to dismiss and, after a hearing, the trial court denied the motion.
Section 12-16-200, Code of Alabama 1975, provides:
"In the investigation of a charge for any indictable offense, the grand jury can receive no other evidence than is given by witnesses before them or furnished by legal documentary evidence, and any witness may be examined and compelled to testify as to any offense within his knowledge without being specially interrogated as to any particular person, time or place."
"While it is clear that a grand jury may not indict merely on their own suspicions and must have sworn witnesses or self-proving documents before them, it is also clear that the State is not required to prove the sufficiency of any such documentary evidence or testimony." Wright v. State, 421 So.2d 1324, 1325 (Ala.Cr.App.1982) (citation omitted). See also Coral v. State, 551 So.2d 1181 (Ala. Cr.App.1989); McConico v. State, 458 So.2d 743 (Ala.Cr.App.1984). "The testimony of a single witness before the grand jury is sufficient to comply with ... § 12-16-200." Wright v. State, 421 So.2d at 1327 (citation omitted). See also McConico v. State. A grand jury may indict on hearsay testimony alone. State ex rel. Baxley v. Strawbridge, 52 Ala.App. 685, 296 So.2d 779 (1974), cert. denied, 292 Ala. 506, 296 So.2d 784 (Ala. 1974); Douglas v. State, 42 Ala.App. 314, 163 So.2d 477 (1963). "In a motion to quash [or dismiss] an indictment alleging failure by the State to present legal evidence to the grand jury, the burden of proof is on the defendant." Wright v. State, 421 So.2d at 1327. See also Sparks v. State, 46 Ala.App. 357, 242 So.2d 403, cert. denied, 286 Ala. 738, 242 So.2d 408 (1970), cert. denied, 402 U.S. 909, 91 S.Ct. 1382, 28 L.Ed.2d 650 (1971).
The record in the instant case reflects that the initial indictment was dismissed on motion of the state because of miscitations in the indictment and the refusal of the appellant to agree to an amendment. After the dismissal, the appellant was re-indicted by the grand jury. The appellant questions the evidence before the grand jury when it returned the second indictment.
The record shows that Terry Jett, an investigator with the Montgomery Police Department, testified before the grand jury that returned the second indictment. Jett was in charge of the investigation of the crime and was familiar with all aspects of it. He testified in detail about the investigation and the appellant's involvement in the commission of *965 the crime, including the appellant's admission to Braden that he had killed the victim. A transcript of Jett's testimony before the grand jury was introduced at the hearing and is a part of the record.
The appellant contends that Jett's testimony was not legal evidence because it contained hearsay. It is true that a portion of his testimony was hearsay based upon the case file and upon information obtained from others; however, some of his testimony concerning the crime and the appellant's involvement in it was direct testimony based upon his personal knowledge of the facts. A review of the record discloses that there was legal evidence presented to the grand jury to support its indictment in this case. The trial court's denial of the appellant's motion to dismiss the indictment on this ground was proper.

III-B.
The appellant contends that the jury verdicts finding him guilty of the lesser included offense of murder under Count I and guilty of the capital offense of murder-burglary under Count II of the indictment are inconsistent. He argues that, because the jury did not find him guilty of first degree robbery under Count I, it was inconsistent for the jury to find him guilty of murder-burglary under Count II, where the intent of the burglary was to commit first degree robbery or theft. Initially, we note that we have ordered that the murder conviction be vacated. However, out of an abundance of caution, we will consider this question. The robbery portion of the murder-robbery count charged that the appellant was in the course of committing a theft by use of force against the person of the victim with intent to overcome her physical resistance or physical power of resistance while he was armed with a deadly weapon or caused serious physical injury to the victim. §§ 13A-8-41 and -43(a)(1). The first degree burglary portion of the murder-burglary count charged that the appellant knowingly and unlawfully entered or remained unlawfully in the victim's apartment with intent to commit the crime of robbery in the first degree or theft of property, and while effecting entry or while in the dwelling or in immediate flight therefrom, he was armed with a deadly weapon or caused serious physical injury to the victim. § 13A-7-5(a)(1) and (2).
After reviewing the facts of the instant case in conjunction with the appropriate charging statutes, we find no merit to the appellant's contention. The fact that the jury did not find the appellant guilty of robbery in the first degree under Count I did not preclude the jury, under the facts of this case, from finding the appellant guilty of burglary in the first degree under Count II. The jury could have reasonably found from the evidence and beyond a reasonable doubt that the appellant knowingly and unlawfully entered the victim's apartment with the intent to commit first degree robbery or theft. If the requisite intent were present at the time of entry, the crime of burglary would have been complete regardless of whether the robbery or theft actually occurred. Our conclusion is supported by the evidence, and particularly by the admission of the appellant to his friend Braden that he entered the victim's apartment to commit a robbery and when surprised by the victim, killed her because "she had too much on him."

III-C.
The appellant contends that the state violated his right against being placed in double jeopardy by using the underlying burglary as an aggravating factor at sentencing. The practice of permitting the use of an element of the underlying crime as an aggravating circumstance is referred to as "double-counting" or "overlap" and is constitutionally permissible. Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); Ritter v. Thigpen, 828 F.2d 662 (11th Cir. 1987); Ex parte Ford, 515 So.2d 48 (Ala. 1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, ___ U.S. ___, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
Moreover, our statutes allow "double-counting" or "overlap" and provide that the jury, by its verdict of guilty of the capital offense, finds the aggravating circumstance encompassed in the indictment to exist beyond *966 a reasonable doubt. See §§ 13A-5-45(e) and -50. "The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence." § 13A-5-50.
In the instant case, the aggravating circumstance that the capital offense was committed while the appellant was engaged in the commission of a burglary, § 13A-5-49(4), was established, as a matter of law, by the appellant's conviction of the capital crime of murder by the appellant during a burglary in the first degree, § 13A-5-40(a)(4). We find no merit in the appellant's contention.

IV.
The appellant contends that his right to a speedy trial as guaranteed by the Sixth and Fourteenth Amendments was violated because of the lapse of 22 months from his arrest to his trial.
The Sixth Amendment, made applicable to the states by the Fourteenth Amendment, protects a defendant's right to a speedy trial after his arrest or indictment. United States v. MacDonald, 456 U.S. 1, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982). The constitutional right to a speedy trial is designed to minimize pretrial incarceration, to reduce the impairment of liberty imposed on a defendant while on bail, and to shorten the disruption of life caused by arrest and unresolved criminal charges. Id. When a court determines that a defendant's Sixth Amendment right to a speedy trial has been violated, it must dismiss the indictment with prejudice. Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).
The Supreme Court of the United States, in Barker v. Wingo, adopted a balancing test, in which the conduct of both the prosecution and the defendant is weighed in determining whether a defendant has been deprived of his right to a speedy trial. The balancing test requires each claim to be considered on a case-by-case basis. The Court identified four factors to be assessed in determining whether a particular defendant has been deprived of his right to a speedy trial. These four factors are: length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. 407 U.S. at 530, 92 S.Ct. at 2192. The Court stated that because the factors are related, they must be considered together with such other circumstances as may be relevant. Id. at 533, 92 S.Ct. at 2193. The Court further stated that "[t]he length of the delay is to some extent a triggering mechanism," and "[u]ntil there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors." Id. at 530, 92 S.Ct. at 2192. The length of a delay that would be considered presumptively prejudicial in any given case would depend upon the peculiar circumstances of that case. Id. at 530, 92 S.Ct. at 2192.
In determining whether the length of the delay in the instant case is presumptively prejudicial, we have reviewed all of those circumstances from the initial arrest to the date of trial, as set out in the record, concerning the delays experienced in bringing the case to trial. The record shows that 22 months elapsed from the date of the appellant's arrest to the date of his trial. We note that this case was a complicated capital case, involving numerous motions and pretrial hearings, one of which required the attendance of numerous witnesses from the states of Alabama and Illinois. Much of the delay was caused by the actions of the trial court in endeavoring to accommodate the appellant and his counsel in every way possible to see that the appellant received a fair trial. One continuance was ordered by the court because of the state's failure to comply fully with the court's discovery order; we do not consider this or anything else to indicate a deliberate attempt by the state to delay the trial in order to hamper the defense. Another continuance was required when the appellant was reindicted because the original indictment cited an incorrect statute, and the appellant would not consent to an amendment. Of the 22 months, 7 months must be attributed to actions of the appellant, for "[t]he State is not responsible for delays that result directly from the defendant's actions," Broadnax v. State, 455 So.2d 205, 207 (Ala. *967 Cr.App.1984). The appellant was granted continuances to accommodate his counsel's schedule, to obtain witnesses, and to obtain a psychiatric examination. The psychiatric examination alone caused a three-month delay. We find that the 22-month delay did not prejudice the rights of the appellant. We also note that the appellant did not raise the issue of his right to a speedy trial until 16 months after his arrest.
Based upon the foregoing, we conclude that the time which elapsed from the appellant's arrest to the date of his trial, taking into consideration the elapsed time attributed to the actions of the appellant, was not presumptively prejudicial. Even though we have concluded that the length of the delay was not presumptively prejudicial, we have, nevertheless, reviewed the record in the light of the remaining factors suggested in Barker v. Wingo, and find no violation of the appellant's right to a speedy trial.

V-A.
The appellant contends that he was denied his constitutional rights by the state's exercise of its peremptory jury strikes in an allegedly racially discriminatory manner, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
The record does not disclose the racial composition of the jury venire or the petit jury that ultimately heard the case. During the selection of the jury, the appellant objected on racial grounds to the state's exercise of 5 of its 16 peremptory strikes. The venirepersons in question were numbered 11, 46, 76, and 77, who were apparently black, and number 20 who was alleged to be Hispanic. Although not consequential to this issue, we note that the record reflects that the appellant is apparently of black and Hispanic ancestry. The trial court required the prosecutor to give his reasons for striking the five venirepersons and did so without first expressly ruling that a prima facie case of discrimination had been established, as recommended by Batson. However, under these circumstances, we will review the findings of the trial court as if a prima facie showing had been made. See Williams v. State, 548 So.2d 501 (Ala.Cr.App.1988), cert. denied, 489 U.S. 1028, 109 S.Ct. 1159, 103 L.Ed.2d 218 (1989).
The prosecutor stated that he struck number 11 because her husband is a minister and the case involved the death penalty. He further stated that he struck her because he believed that, as a minister's wife, she would be inclined to forgive a wrong rather than to punish someone for it, as the state was seeking to do. The prosecutor stated that he struck a white venireperson for the same reason. The prosecutor stated that he struck number 46 because, when specifically questioned on voir dire, she expressed strong feelings against the death penalty. The prosecutor stated that he struck number 76 because he had a conviction for assault and battery, and number 77 because he had been arrested for possession of a pistol without a license, and this case involved a defendant who had possession of a pistol without a license. In reference to the venireperson number 20, Ivan Gonzalez, who is allegedly Hispanic, the prosecutor stated that he struck him thinking that he was Caucasian. He stated that the venireperson was not struck on the basis of race, but was struck near the end of the selection process in order to form a jury. The appellant introduced into evidence a copy of a juror qualification questionnaire, which had been completed by venireperson number 20 and returned to the county jury commission prior to his being summoned to serve. On the questionnaire, the venireperson listed his race as "Hispanic." The state introduced a juror data sheet that pertained to him and that had been prepared by the office of the district attorney to aid the prosecutor in striking the jury. This data sheet shows the juror's race as "white." There was no evidence that the prosecutor was privy to the jury commissioner's juror qualification questionnaire.
After hearing the prosecutor's reasons for striking the potential jurors in question, the trial court, obviously finding the reasons to be race neutral, overruled the appellant's objections. In our review, we accord the trial court's ruling great deference, and we may reverse the trial judge's ruling only if that ruling is clearly erroneous. Ex parte Lynn, 543 So.2d 709 (Ala.1988), cert. denied, *968 493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989); Ex parte Branch, 526 So.2d 609 (Ala. 1987). We have reviewed the reasons given for striking the five potential jurors in question, and we conclude that they were sufficiently specific and legitimate reasons that related to the case and were nondiscriminatory. We find no clear error in the trial court's ruling, and thus it should stand.

V-B.
The appellant contends that the trial court erred in refusing his request for individual voir dire of the jury venire. In Alabama, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination. This rule applies to capital cases, and the granting of a request for individual voir dire is discretionary with the trial court. Browning v. State, 549 So.2d 548 (Ala.Cr. App.1989); Bui v. State, 551 So.2d 1094 (Ala. Cr.App.1988), aff'd, 551 So.2d 1125 (Ala. 1989), vacated, 449 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991). In the instant case, the trial court required the parties to submit proposed voir dire questions, and it decided which questions it would ask; however, the court did allow individual voir dire questioning of all veniremembers in reference to their views concerning the imposition of the death penalty. The record reflects a thorough and comprehensive voir dire examination of the prospective jurors. We conclude that the trial court did not abuse its discretion in its handling of the voir dire examination, and thus find no error.

V-C.
The appellant contends that error occurred by the trial court's refusal to permit him to ask certain rehabilitation questions of prospective juror H.B. On voir dire, H.B., when asked by the trial court about his views on the death penalty, stated that he was opposed to it under any circumstances and that he could not give a death penalty sentence regardless of the facts. He further stated that to sentence someone to the death penalty would cause him to violate his oath as a juror, and that he thought that the death penalty was a violation of the Bible and the teachings of his Savior, Jesus Christ. The appellant's counsel sought to question the venireperson further. The record in this regard shows the following:
"THE COURT: Tell me what you want to ask.
"MR. TRAVIS: I would like to make sure the juror understands that everybody is entitled to a jury of his peers, and that includes people of all opinions, varying opinions, different opinions and not just a jury of one opinion, becauseI would like that question be asked.
"THE COURT: Well, you can state that for the record. I don't think that based on what he's answering it's relevant.
"MR. TRAVIS: The question I'd like to ask [H.B.] was whether or not he believes in the system of justice that we have that entitles a criminal defendant to a jury of his peers, those peers being a mixture of persons of all opinions, persuasions and beliefs and not just a jury of one opinion. Whether or not he believes in that principle of law.
"THE COURT: Okay. Any other questions?
"MR. TRAVIS: Am I being denied the opportunity to have [H.B.] answer the question?
"I just want it clear.
"THE COURT: Yes. I don't think that that's what this whole hearing is all about. I already made a ruling."
We find no error in the refusal of the trial court to permit the question. It could not be characterized as rehabilitation of the potential juror, and the question was, as the trial court stated, irrelevant to the issue before the court. The appellant did not attempt to question H.B. further.

V-D.
The appellant contends that error occurred when the trial court discharged prospective juror H.M. because of his opposition to the death penalty. After H.M. stated his strong opposition to the death penalty under any circumstances, he stated, "I got privilege to change my mind" and "it depends on the *969 circumstances." The record shows the following:
"THE COURT: Are you opposed to the death penalty under any circumstances?
"PROSPECTIVE JUROR [H.M.]: I am.
"THE COURT: Could you never give the death penalty regardless of what the facts are, or are you just generally opposed to the death penalty?
"PROSPECTIVE JUROR: I've been opposed to it all my life.
"THE COURT: Are there any conceivable set of circumstances under which you would be willing to serve as a juror and give the death penalty?
"PROSPECTIVE JUROR: Un-huh. I'm against it, period.
"THE COURT: Okay.
"MR. TRAVIS [defense counsel]: Judge, we'd ask that you ask this juror the same question that was posed to another juror concerning children, his children.
"THE COURT: If a child with whom you were acquainted, or even conceivably your own child, was killed by someone just indiscriminately throwing a hand grenade or whatever into a bunch of kids, could you conceive of giving the death penalty under one of those circumstances?
"PROSPECTIVE JUROR: Providing I don't get to him first. I still wouldn't vote for the death penalty. See, I might get to him first.
"THE COURT: Well, are you telling me that you may take the law into your own hands and administer the death penalty on your own but you would be opposed to administering it in an orderly fashion?
"PROSPECTIVE JUROR: See, Judge, if I had a gun and caught that guy in the act, which is very seldom done, I'd light him up. Without taking the trial to waste our money. I still, though, am against the death penalty.
"THE COURT: I guess you're telling me you would be against anybody else doing it besides you.
"PROSPECTIVE JUROR: Not really. It depends on the circumstances how I did it. It could be on my property, anything. Depends on where he is. It wouldn't make no difference where he was if I caught him, and I think I'd go along with a lot of citizens in this country which is built up under thatself-preservation firstof our nature.
"THE COURT: But you're opposed to the death penalty under any circumstances.
"PROSPECTIVE JUROR: I'm opposed to the death penalty. It depends on the circumstances, but not for the State, no. I'm against the death penalty. Cause that don't make them no better off than the rest. Don't solve the problem, don't go down on crime. It don't decrease crime. Got to build more jails. It's not decreasing anything. It doesn't deter anything. Got to build more jails now. They're full. What the Bible say about the prison? If it wasn't lead the people
"THE COURT: Okay.
"MR. BECHER [assistant district attorney]:... Could you ask him if he did catch him in the act and didn't get to him and served on the jury, would he then go ahead and oppose it? He said that he would get him if he could, but what I would like to know if he didn't catch him.
"THE COURT: What if you didn't catch him but somebody else caught him and he came to Court and it was up to a government of laws to administer what you said you would administer on your own.
"PROSPECTIVE JUROR: But suppose the jury that I'm onit's my kid and I went for it and somebody else didn't on the jury. Same thing.
"THE COURT: Are you saying you may go for it on that jury?
"PROSPECTIVE JUROR: No. No. That would be two people wouldn't go for it. But if I did go for it, which I got privilege to change my mind, if I did go for it, suppose she didn't go for it or he didn't go for it. Same thing."
"[T]he proper standard for determining when a prospective juror may be excluded for cause because of his ... views on capital punishment is ... whether the juror's views would `prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *970 Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (quoting Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). It is not required that a prospective juror's bias in this regard be proved with "unmistakable clarity." Id. 469 U.S. at 424, 105 S.Ct. at 852.
"[M]any veniremen simply cannot be asked enough questions to reach the point where their bias has been made `unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. [T]his is why deference must be paid to the trial judge who sees and hears the juror."
Id. at 424-26, 105 S.Ct. at 852-53 (footnote omitted).
We have reviewed the voir dire examination of H.M. in reference to his views on the death penalty, and conclude that he was properly excused for cause. The situation here is a classic example of what the Court was referring to in Wainwright v. Witt. The court, in excusing H.M. for cause, obviously concluded that he would be unable to faithfully and impartially apply the law, and the record fully supports the ruling of the trial court.

VI-A.
The appellant contends that the trial court erred in denying his motions to suppress his extrajudicial statements. He filed motions on March 16, and October 7, 1988, seeking to suppress statements that he alleges were made while he was detained pursuant to an illegal arrest and that he alleges were obtained without Miranda warnings and by coercion.
The record discloses that the appellant made three statements to the police. The first statement was a tape-recorded statement made in Chicago, Cook County, Illinois, to Officer D.T. Marshall of the Montgomery, Alabama, police department on October 7, 1987. The second statement was an oral statement made in Saline County, Illinois, to Sergeant Kenneth H. Clore of the Illinois State Police on November 6, 1987. The third statement was an oral statement made to Montgomery Police Officer Terry Jett at the Montgomery police station on November 11, 1987, while the appellant was being booked into the municipal jail after having been returned to Alabama from Saline County, Illinois. The first and second statements were the subjects of the pretrial suppression hearing. A transcription of the first was admitted in evidence, and Clore testified to the substance of the second. The third statement, the substance of which was relayed by Jett, was objected to by the appellant at the time it was offered at trial.
The record discloses that on September 24, 1987, Clore, after receiving a report from the Alabama authorities identifying the license plate on the appellant's black Trans Am automobile and after discovering that it belonged to another vehicle, obtained a warrant for the arrest of the appellant for the felony offense of unlawful possession of an Illinois motor vehicle license plate. A pick-up order was sent out with instructions to all police to arrest the appellant on sight and to hold him for the Saline County police on the authority of the arrest warrant.
The appellant was arrested in Chicago on October 6, 1987, for auto theft, an unrelated offense. On the morning of October 7, Marshall talked briefly with the appellant as the appellant was preparing to attend court in reference to the auto theft charge. He introduced himself, told the appellant that he wanted to interview him about the murder of the victim, and asked him if he knew the victim. This conversation was not recorded, and no Miranda rights were given. The record does not show whether the appellant answered Marshall's questions as to whether he knew the victim; however, a reading of the later taped statement given to Marshall indicates that the appellant initially denied knowing the victim.
At the court proceedings, the auto theft charge was dropped. Immediately upon the appellant's release by the Cook County authorities *971 on the auto theft charge, he was arrested by a Chicago police officer on the authority of the Saline County pickup order. Shortly thereafter on the same date, the Saline County warrant arrived and was served on the appellant. Later in the afternoon, while the appellant was under arrest for the Saline County charge of unlawful possession of a motor vehicle license plate, Marshall questioned the appellant about the murder of Nancy Burt. This interrogation lasted for approximately one and one-half hours and was tape-recorded. Marshall testified at the suppression hearing and at trial that prior to commencing the interrogation, he advised the appellant of his Miranda rights and that the appellant acknowledged that he understood them, waived the right to counsel, and agreed to make a statement. Marshall further testified that he made no promise to the appellant and that he did not threaten or coerce him. The appellant testified at the suppression hearing that Marshall did not advise him of his Miranda rights. An examination of the statement discloses that it is neither a confession nor an admission. It is exculpatory and a denial of any knowledge of or participation in the murder-burglary. The appellant stated, inter alia, that he was not in Montgomery, Alabama, when the crime was committed; that he had left the city to return to Illinois around 3:00 p.m. on the date of the crime; and that he never owned a .32 caliber pistol.
On the following day, October 8, 1987, after the appellant had been moved from the Chicago jail to the Saline County jail, Marshall attempted to question him again, and the appellant advised him that he "had been talking to somebody and didn't want to get involved and ... he wanted to talk to his lawyer." Marshall did not attempt to question the appellant further.
On November 6, 1987, Clore questioned the appellant at the Saline County jail. Clore testified at the suppression hearing and at trial that he advised the appellant of his Miranda rights before the interrogation; that the appellant stated that he understood his rights; that the appellant waived his right to the presence of an attorney and agreed to make a statement; and that he did not threaten or coerce the appellant in any manner and did not promise him anything to get him to make a statement. Clore testified at the suppression hearing and at trial, giving the substance of the oral statement. The statement, like the statement previously given Marshall, was exculpatory and was neither a confession nor an admission. The appellant denied any knowledge of the crime; stated that he left Montgomery around 3:00 p.m. on the date of the crime and was therefore not in Montgomery when the crime was committed; and denied ever owning a .32 caliber pistol.
On November 11, 1987, Jett, pursuant to a murder warrant, accompanied the appellant from Saline County, Illinois, to Montgomery, Alabama. While the appellant was being processed into the municipal jail, Jett read him his Miranda rights, obtained a signed waiver of those rights from him, and asked him "why he had been running from [him] in Illinois." According to Jett, the appellant responded "that he had heard the police were going to kill him," and that "if we thought he had done it, to prove it." This statement was not a confession. It can be interpreted as an admission of flight because he thought the police were going to kill him. The latter part of the statement stating that "if we thought he had done it, to prove it" was a spontaneous, unsolicited remark, and had no relevance to any of the issues in the case.
Extrajudicial confessions are prima facie involuntary and inadmissible, and the burden is upon the state to show voluntariness and a Miranda predicate in order for them to be admitted. Lewis v. State, 535 So.2d 228, 234 (Ala.1988). "[I]nculpatory admissions in the nature of a confessionthat is, directly relating to the facts or circumstances of the crime, and connecting the defendant therewithare subjected to the same rules of admissibility, as direct confessions, and are therefore prima facie involuntary and inadmissible." McGehee v. State, 171 Ala. 19, 22, 55 So. 159, 160 (1911) (citations omitted). No distinction is made between inculpatory and exculpatory statements. Miranda, 384 U.S. at 477, 86 S.Ct. at 1629. Exculpatory statements are "incriminating in any meaningful sense of the word *972 and may not be used without the full warnings and effective waiver as any other statement." Id. See also Rhode Island v. Innis, 446 U.S. 291, 301, n. 5, 100 S.Ct. 1682, 1690, n. 5, 64 L.Ed.2d 297 (1980); Arthur v. State, 575 So.2d 1165 (Ala.Cr.App.1990), cert. denied, 575 So.2d 1191 (Ala.1991).
"Whether there was a waiver of the right to remain silent and the right to counsel and[, if so,] whether it was knowingly, voluntarily, and intelligently made must be decided from the particular facts and circumstances of each case, including the background, experience, and conduct of the accusedthe totality of the circumstances."
Lewis v. State, 535 So.2d at 234. See also Magwood v. State, 494 So.2d 124 (Ala.Cr. App.1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986); Thomas v. State, 373 So.2d 1167 (Ala.1979), vacated on other grounds, 448 U.S. 903, 100 S.Ct. 3043, 65 L.Ed.2d 1133 (1980).
"The question of whether a confession was voluntary is initially to be determined by the trial court. Ex parte Singleton, 465 So.2d 443 (Ala.1985). Thereafter, the voluntariness as affecting the credibility and weight to be given any statement that an accused has made is a determination for the jury. Id."
Lewis v. State, 535 So.2d at 235. As we have stated, the same rules apply whether the statement is a confession or admission or whether it is inculpatory or exculpatory. Miranda, 384 U.S. at 477, 86 S.Ct. at 1629.
"The finding of the trial court will not be disturbed on appeal unless it appears to be contrary to the great weight of the evidence or is manifestly wrong. Magwood v. State; Marschke v. State, 450 So.2d 177 (Ala.Cr.App.1984).... The trial court need only be convinced from a preponderance of the evidence to find a confession to have been voluntarily made. Ex parte McCary, 528 So.2d 1133 (Ala.1988); Ex parte Singleton."
Lewis v. State, 535 So.2d at 235.
"[A] confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession `is sufficiently an act of free will to purge the primary taint.' Brown v. Illinois, [422 U.S. 590,] 602 [95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975)] (quoting Wong Sun v. United States, 371 U.S. 471, 486 [83 S.Ct. 407, 416-17, 9 L.Ed.2d 441] (1963))."
Taylor v. Alabama, 457 U.S. 687, 690, 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314 (1982). See also Ex parte Meeks, 434 So.2d 844 (Ala. 1983); U.S. Const. amend. IV. "`The fact that the confession may be "voluntary" for purposes of the Fifth Amendment, in the sense that Miranda warnings were given and understood, is not by itself sufficient to purge the taint of the illegal arrest.'" Ex parte Meeks, 434 So.2d at 848 (quoting Taylor v. Alabama, 457 U.S. at 689, 102 S.Ct. at 2666).
The appellant contends that the statement that he gave Marshall on October 7, 1987, in Chicago, was obtained through custodial interrogation after he had been illegally arrested and thus should have been suppressed. He does not question the factual basis for the issuance of the Saline County warrant for unlawful possession of a motor vehicle license plate, but argues that it was obtained in order to give the police a pretext for arresting the appellant so that they could question him about the murder.
"It is well established that `[a]n arrest may not be used as a pretext to search for evidence.' United States v. Lefkowitz, 285 U.S. 452 [52 S.Ct. 420, 76 L.Ed. 877] ... (1932)." Scarbrough v. State, 621 So.2d 996 (Ala.Cr. App.1992). However, we find no merit to the appellant's contention. Immediately upon the appellant's release from the unrelated auto theft charge, he was arrested by a Chicago police officer on the authority of the Saline County felony warrant. The Cook County authorities were aware of the Saline County warrant when the later arrest was made, and when the warrant arrived later that day it was served on the appellant. The appellant was not interrogated until after he had been arrested pursuant to the Saline County warrant. We conclude that the arrest was valid. "Where the arrest is one that *973 can be made without a warrant, on probable cause, a peace officer's knowledge of the existence of an outstanding warrant constitutes probable cause on which he may make the arrest, although he does not have the warrant." 5 Am.Jur.2d Arrest § 72 (1962) (footnote omitted). There is no evidence to support the appellant's contention that the Saline County warrant was obtained through the connivance of the Alabama and Saline County authorities as a pretext to have the appellant arrested so that he could be questioned about the murder.
We further conclude that there was sufficient evidence to support the trial court's finding that the statement given to Marshall on October 7, 1987, was not obtained by coercion or promise of any kind and that it was knowingly, voluntarily, and intelligently given after waiver of proper Miranda warnings and was, thus, admissible into evidence.
However, we conclude that the appellant's other statements elicited by subsequent questioning were erroneously admitted. Prior to the questioning by Clore and Jett, the appellant had told Marshall on November 8, that he "had been talking to somebody and didn't want to get involved and ... he wanted to talk to his lawyer." We think that this was a sufficient invocation of his Miranda right to counsel. There is absolutely no evidence in the record that the appellant, after invoking the right to counsel, made a voluntary and intelligent waiver of that right by initiating the subsequent conversations with the authorities.
The Miranda right to counsel attaches only when a suspect invokes his right during custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). When a suspect asserts his Miranda right to counsel, law enforcement officials must cease all interrogation until counsel is provided, unless the suspect himself initiates further communication with the police. Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). "[W]hen counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." Minnick v. Mississippi, 498 U.S. 146, 153, 111 S.Ct. 486, 491, 112 L.Ed.2d 489 (1990). We are of the opinion that the December 6 statement given to Clore and at least a portion of the November 11 statement to Jett were inadmissible products of police-initiated custodial interrogations that occurred after the appellant had invoked his right to counsel, in violation of the mandates of Edwards v. Arizona and Minnick v. Mississippi. Whether Clore and Jett knew of the appellant's prior invocation of his right to counsel is immaterial. The state's knowledge is imputed from one state actor to another. Arizona v. Roberson, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988); Arthur v. State.
After finding error, an appellate court may still affirm a conviction on the ground that the error was harmless. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Sattari v. State, 577 So.2d 535 (Ala.Cr.App.1990), cert. denied, 577 So.2d 540 (Ala.1991); A.R.App.P. 45. The harmless error rule applies in capital cases. Ex parte Whisenhant, 482 So.2d 1241 (Ala. 1983); Henderson v. State, 583 So.2d 276 (Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992); Musgrove v. State, 519 So.2d 565 (Ala.Cr.App.), aff'd, 519 So.2d 586 (Ala.1986). We must now determine whether, under the facts and circumstances of this case, the admission of these statements was harmless. The appropriate standards for determining whether error was harmless is set forth in Chapman v. California, and A.R.App.P. 45. In order for a constitutional error to be deemed harmless under Chapman, the state must prove beyond a reasonable doubt that the error did not contribute to the verdict. In order for the error to be deemed harmless under Rule 45, the state must establish that the error did not injuriously affect the appellant's substantial rights.
In regard to the statement to Clore, it appears that the substance and meaning of the statement made to Marshall, which was properly admitted, and the substance and meaning of the statement made to Clore are the same. Therefore, we fail to see how any *974 injury or prejudice to the substantial rights of the appellant occurred from the admission of the statement to Clore. We are also convinced beyond a reasonable doubt that the erroneous admission of the statement to Clore could not have contributed to the appellant's conviction. Because the statement to Clore was merely cumulative of the evidence contained in the statement to Marshall, we have no reasonable doubt that the jury would have reached the same verdict had it not heard Clore's testimony concerning the statement. We thus find that any error in its admission was harmless beyond a reasonable doubt. See Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), and cases cited therein, (harmless error rule may be applied to the admission of involuntary confession); Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) (subsequent confession erroneously obtained in violation of defendant's right to counsel held harmless error in view of first confession, which was substantially the same and which was properly obtained); Shepard v. State, 417 So.2d 614 (Ala. Cr.App.1982) (subsequent statement erroneously obtained in violation of defendant's right to counsel, held harmless error in view of earlier, substantially identical, admissible statement); Cork v. State, 50 Ala.App. 670, 282 So.2d 107 (Ala.Cr.App.1973) (adopting rule of Milton v. Wainwright).
Applying the harmless error analysis prescribed by Chapman and Rule 45 to the statement to Jett, in the light of the entire record, we believe beyond a reasonable doubt that the erroneous admission of this statement could not have contributed to the verdict and that it did not injuriously affect the appellant's substantial rights. The appellant's explanation, in response to Jett's question as to why he ranthat he had heard that the police were going to kill himis cumulative of more serious admissions of flight in the appellant's statement to Marshall, which was properly admitted into evidence and which was properly before the jury. In the appellant's statement to Marshall, he stated that Somers and Braden had told him that the police from Alabama were looking for him because of a murder; that he had told Braden that, as soon as he could get enough money, he was going to get a lawyer and "go down there" and find out what it was all about; that he did not want to go to jail "down there"; and that, after learning that the police were looking for him, he hid his black Trans Am automobile in the woods, removed the tag, stole a truck, and drove to Chicago. In view of the damaging admissions of flight in the appellant's statement to Marshall, we cannot see how the appellant could have suffered any injury or prejudice from the admission of flight to Jett.
The second part of the statement to Jett "if we thought he had done it, to prove it"is also similar and cumulative of statements made by the appellant to Marshall. The appellant stated the following to Marshall: "When I go I'll have a jury trial over this and that will be that. That's all. You produce the evidence you got or whatever and it will go from there ... I'm just saying whatever you got there you go with what you gotta do and let me find out if I'm guilty.... If I'm not, I'm not." We note also that the latter statement to Jett was volunteered and spontaneous and not in response to a question directed to the appellant. In addition, it was irrelevant to any issue and added nothing to the state's case See United States v. Bruno, 809 F.2d 1097 (5th Cir.), cert. denied, 481 U.S. 1057, 107 S.Ct. 2198, 95 L.Ed.2d 853 (1987); Kuenzel v. State, 577 So.2d 474 (Ala. Cr.App.1990), aff'd., 577 So.2d 531 (Ala.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
To summarize, we hold that the appellant's statement to Marshall was admissible, because it was knowingly and voluntarily made with proper Miranda warnings and was not the product of an illegal arrest; that his subsequent statements to Clore and Jett were erroneously admitted because they were products of custodial interrogation that occurred after the appellant had invoked his right to counsel; and that even though the admission of the statements to Clore and Jett were erroneous, their admission was harmless.

VI-B.
The appellant contends, in section V of his original brief and in sections VI(2) and *975 VII of his supplemental brief, that under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), he was denied due process because of the state's failure to timely comply with the trial court's discovery orders in reference to alleged exculpatory evidence. He specifically refers to the oral statement that he gave to Officer Clore on November 6, 1987, and to statements made to the Montgomery police by the child witness and his father during the course of the investigation of the case.
The crime for which the appellant stands convicted occurred on September 18, 1987; he was indicted on March 7, 1988; and the trial court granted his motions for discovery, which requested Brady material, on August 18, 1988, and May 17, 1989. The May 17 discovery order required the state to make its entire file and the Montgomery Police Department file available to the appellant.
The case was called for trial on August 7, 1989, and during a pretrial hearing on the appellant's motion to suppress the statement that he had given Marshall, Clore testified, inter alia, that he had taken an oral statement from the appellant on November 6, 1987. The appellant's counsel claimed that this was the first knowledge they had of the statement, that it was exculpatory, and that the state's failure to inform them of the statement constituted a violation of the discovery order and of the appellant's due process rights. The record discloses that an assistant district attorney who was at one time in charge of the prosecution, but who was no longer employed by the state, had knowledge of the existence of the Clore statement almost from its inception. However, the present prosecutors, who were new on the case, professed to have had no prior knowledge of the statement. We believe, after reviewing the record, that the failure of the present prosecutors to inform the appellant of the statement was unintentional and was caused by their negligence in discovering its existence.
During this same suppression hearing, the statements to the Montgomery police by the child witness and his father were brought to the attention of the trial court for the first time by the appellant. The appellant argued that the state was guilty of a Brady violation by its suppression of their allegedly exculpatory statements, which had been in the police files for approximately two years. The record shows that, although the trial court ordered the disclosure of these police files on May 17, 1989, thus making the information available to the appellant on that date, the appellant's counsel did not examine the police files until July 24, 1989, 10 days before the case was set for trial.
The record does not present a very clear rendition of the contents of the police files and of the circumstances surrounding the taking of the statements of the child witness and his father. The only information that we can glean about the contents of the files is that which is encompassed in counsel's arguments during the hearing and that which was presented by the testimony of Officer Jett, who was in charge of the entire investigation. In fact, no police summary and/or transcript of any statement made by either the child or his father was offered into evidence.
The evidence is in dispute as to how many statements were made by the child and his father and whether those statements were recorded. Discussion about the police files indicates that the child made two recorded statements and that the child's father made a statement that was recorded and eventually transcribed; however, Jett testified that the child's statements were never recorded and that only the father's statement was recorded. It is clear, however, that the subject matter of the child's statements was his observations near the crime scene on the night of the murder-burglary and that the main subject matter of the father's statement was his son's version to him, the morning after the crime, of the prior evening's disturbance. Defense counsel represented to the court that a police summary in the police file showed the following:
"[The child,] age seven at the time, stated to his dad that he had seen the victim get out of a black car and approach and go into her apartment, that shortly thereafter that he had seen a white male follow her into that apartment, kick on the door, finally use his key and go in, and that within fifteen or twenty minutes thereafter a *976 sound was heard that could or may not have been a shot, and that that same male was seen leaving."
It further appears that the child and his father made statements on the day following the crime, and defense counsel also represented that the police summary indicated that they were called to the police station a second time, whereupon a second statement was made and the child was shown a picture of the appellant whom he did not identify as the person he saw enter the apartment. The prosecutor represented to the trial court that the father, in his statement, did not state that his son referred to the man he saw as a "white man" but only as a "man," and did not give any information that would indicate that the person his son saw was not the appellant.
The police were apparently skeptical of the child's statement, due to his age and to some unspecified indication that he might be "retarded." The police had the child interviewed by a psychologist in an effort to determine his reliability. The sparse record before us on this matter indicates that the psychologist was of the opinion that the child "didn't know really what he saw." The appellant's counsel obtained the report of the psychologist from the police file.
Upon conclusion of the hearing on August 7, the trial court continued the trial of the case for approximately one month. It explained its ruling as follows:
"The Court, based on the State's failure to comply with Brady, obvious noncompliance with the Court's order well over a year ago, and noncompliance until ten days ago with the Court's order of three months ago which said turn everything over including the police file, because of problems that we've had with the State complying with Brady, I have no other alternative but to continue this case."
The record discloses that the appellant's counsel subsequently interviewed the child and his father prior to trial and had witness subpoenas issued to them. At trial, the state did not call either of them as witnesses; however, the appellant moved the trial court to call the child as the court's witness, so that he could be asked leading questions. The child was called as a court witness, and his father was permitted, by agreement of the parties, to stand beside him during his testimony. The majority of the child's testimony is as follows:
"Q. [Defense counsel:].... Now, on that occasion, as I recall, you and maybe your little brother stayed out on the playground?
"A. (Witness nods head up and down.)
"Q. And you saw some things that night that you told your daddy a bout the very next day, didn't you?
"A. (Witness nods head up and down.)
". . . .
"Q. Do you recall telling your daddy that night that you saw a lady get out of a black car right after the time you got home?
"A. (Witness nods head up and down.)
". . . .
"Q. Do you recall telling him you saw a white man get out of a white car and follow her?
"A. Yes.
"Q. Now, he asked you, I believe, if this was like a Mustang, and I think you said it was smaller than a Mustang, did you not?
"A. Yes.
". . . .
"Q. Now, you remember the breezeway there between the apartments where Nancy lived?
"A. (Witness nods head up and down.)
"Q. And did you see the man follow the woman through the breezeway?
"A. Yes.
"Q. And you told your daddy that the next day, didn't you?
"A. Yes.
"Q. Now, did this man have anything with him?
"A. (Witness whispers to his father.) A gun.
"Q. And did you see him do anything to the door or with the door?
"A. Kick it.
". . . .
"Q. Was that the door there in the breezeway?

*977 "A. Yes.
"Q. Did thatdid you ever see that man use a key?
"A. No.
"Q. Did you not tell your daddy you saw him use a key to go in the door?
"A. No.
"Q. You don't recall that? Do you remember telling him he went in that door?
"A. Yes.
"Q. All right. Now, at any timedo you know what time this was? Was it after dark?
"A. (Witness whispers to his father.) Nine o'clock.
"Q. About nine o'clock. All right. And were you still outside playing at this time?
"A. Yes.
"Q. Did you later go inside after you had seen this?
"A. Yes.
"Q. At any time that night did you hear anything?
"A. A gunshot.
"Q. And how longdo you know about when you heard that or about how long it was after you went inside?
"A. Not long.
"Q. And did you ever see anyone leave that night?
"A. Yes.
"Q. Did you see `em leave the apartment?
"A. Yes.
"Q. And did he go out the same door he came in?
"A. Yes.
"Q. Now, were youdo you remember if you were inside or outside when you heard the shot?
"A. Um, outside.
"Q. All right. Then after this sound, you saw someone leave through that door?
"A. Yes.
"MR. BECK [defense counsel]: .... That's all I have at this time, your Honor. Thank you.

"CROSS-EXAMINATION
"BY MR. BECHER [prosecutor]:
". . . .
"Q. [I]s the man that had the gun that night that you saw, is he in the courtroom today?
"A. Um, I sawpeaked in from that window. I saw him in a black jacket.
"Q. Okay. What I want to know isI want you to just look around ... the courtroom, okay? (Brief pause.) Is he in the courtroom?
"A. (Witness indicating.)
"Q. And where are you pointing? ... Is it somebody that is at this table here?
"A. (Witness nods head up and down.)...
"Q. Are you pointing to this man here (indicating)?
"A. (Witness nods head up and down.)
"MR. BECHER: That's all the questions I have, Judge.

"RECROSS-EXAMINATION
"BY MR. BECK:
"Q..... You know a little boy named Bobby that plays there?
"A. Um, yeah?
"Q. And do you know Bobby's daddy?
"A. Yes.
"Q. And you know what Bobby's daddy looks like?
"A. Yes.
"Q. And is he here today?
"A. Yes.
"Q. And can you point him out?
"A. (Witness indicating.)
"Q. Is that the same one you just pointed out a while ago?
"A. Um-hum.
"Q. And you'd see him around there where you used to live several times, hadn't you?
"A. Um-hum.
"Q. And you knew him as Bobby's daddy, didn't you?
"A. Um-hum.

*978 "MR. BECK: I believe that's all I have, your Honor.
"MR. BECHER: I don't have anything further, Judge."
The father was called as a witness by the appellant, and testified, in pertinent part, as follows:
"Q. [Defense counsel]: Do you recall this occasion when [your son]when that happened on that night?
"A. Yes, sir.
"Q. The very next day, that Saturday, did you have an occasion to talk to your son,...?
"A. Yes, sir, he talked to me Saturday morning.
"Q. And had you or anyone to your knowledge, discussed with him the incidents of the night before or anything?
"A. He just woke up that morning and said somebody scared him outside that night.
"Q. Did you even know at that time yourself what had happened?
"A. No, sir, not till later on that afternoon.
"Q. Did you in any way influence him or put any words in his mouth or anything like this?
"A. No, sir.
"Q. Did he, in fact, tell you that he saw a lady come home in a black car?
"A. Yes, sir.
"Q. And that he saw a white man get out of this little white car?
"A. Yes, sir..... He said it was a little small white car.
"Q..... Now, did he not say that on that occasion that the man let himself in with a key?
"A. He had told me that night that he saw somebody go to the door and kick it and push his way in.
"Q. Did he not tell you he used a key to get in?
"A. He might have, sir, but I don't really remember.
". . . .
"Q. Do you recall telling the officer that interviewed you that [your son] told you that the guy kicked at the door and pushed at it and finally let himself in with a key?
"A. Yes, sir.
"Q..... Did you hear anything that night that sounded loud or
"A. I heard some popping but I thought it was fireworks, you know, it being football season I thought it just might be somebody celebrating a football victory.
"A. About what time did you hear that?
"A. Between nine fifteen and nine thirty.
"Q. Now, do you recall that the police came out and talked to you and [your son] within a couple of days after this happened?
"A. Yes, sir.
"Q. At that time did they not show you and [your son] a picture of Mr. Coral?
"A. Yes, sir.
"Q. And on that occasion, [your son] recognized Mr. Coral as Bobby's daddy, didn't he?
"A. Yes, sir.
"Q. Didn't indicate that Mr. Coral was the one that he saw this night in question, was it?
"A. No, sir.
"Q. Later, as I understand, you went down to the police station, did you not?
"A. Yes, sir.
"Q. And [your son] went down also?
"A. Yes, sir.
"Q. And as a result of that interview at the police station then, I believe your son then said he recognized a picture that looked like Mr. Coral; is that right?
"A. Yes, sir.
"Q. As far is you know, that Saturday, are you the first person that [your son] talked to after this incident happened on that night?
"A. Yes, sir.
"Q. Since talking to you has he talked to the police on more than one occasion?
"A. Yes, sir.
"Q. And had he also been under the care of a psychologist?

*979 "A. He has gone to a police psychologist, yes, sir.
"Q. He did that at the insistence of the police?
"A. Yes, sir.
"MR. BECK: I believe that's all. Thank you.

"CROSS-EXAMINATION
"BY MR. BECHER [prosecutor]:
"Q. [R]emember you said you had heard a pop that night?
"A. Yes, sir.
"Q. Okay. That was while your son was still outside, right?
"A. Yes, sir.
"Q. All right. When you talked to [your son] about the person that he saw that had the gun that shot Nan.... did you ask him ififand even point to your skin and say was hedoes he have skin like mine? White?
"A. Yes, sir.
"Q. And he said no, right?
"A. Right.
"Q. And then you asked him if he had skin like a person that you worked with that was a black person, right?
"A. Yes, sir.
"Q. And he said no?
"A. Yes, sir.
"Q. And his answer to you then was when you asked him what colorhe said he was brown, right?
"A. Yes, sir.
"Q. In between white and black, right?
"A. Yes, sir.
"Q..... [Your son] has told you before today that Robert Coral was the one with the gun, right?
"A. Yes, sir.
"Q. How many times has he told you that?
"MR. BECK: Your Honor, we object to that.
"THE COURT: Sustained.
"MR. BECHER: I have no further questions.

"DIRECT EXAMINATION
"BY MR. BECK [defense counsel]:
"Q. He told you that after your interview with the police; is that correct?
"A. He told me when we went downtown, sir.
"MR. BECK: Yes, sir, that's all."
In Brady v. Maryland, 373 U.S. at 87, 83 S.Ct. at 1197, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." To establish a Brady violation, a defendant must show that (1) the prosecution suppressed evidence, (2) the evidence suppressed was favorable to the defendant or was exculpatory, and (3) the evidence suppressed was material to the issues at trial. Ex parte Kennedy, 472 So.2d 1106 (Ala.1985), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). "Materiality" requires a finding that, had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. A "reasonable probability" is one sufficient to undermine confidence in the result. Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); United States v. Burroughs, 830 F.2d 1574 (11th Cir.1987), cert. denied, Rogers v. United States, 485 U.S. 969, 108 S.Ct. 1243, 99 L.Ed.2d 442 (1988); Ex parte Dickerson, 517 So.2d 628 (Ala. 1987); Thompson v. State, 581 So.2d 1216 (Ala.Cr.App.1991).
Tardy disclosure of Brady material is generally not reversible error unless the defendant can show that he was denied a fair trial. United States v. Gordon, 844 F.2d 1397 (9th Cir.1988); United State v. Shelton, 588 F.2d 1242 (9th Cir.1978), cert. denied, 442 U.S. 909, 99 S.Ct. 2822, 61 L.Ed.2d 275 (1979); Ex parte Raines, 429 So.2d 1111 (Ala.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983); McClain v. State, 473 So.2d 612 (Ala.Cr.App.1985). A *980 delay in disclosing Brady material requires reversal only if "the lateness of the disclosure so prejudiced appellant's preparation or presentation of his defense that he was prevented from receiving his constitutionally guaranteed fair trial." United States v. Shelton, 588 F.2d at 1247 (quoting United States v. Miller, 529 F.2d 1125, 1128 (9th Cir.), cert. denied, 426 U.S. 924, 96 S.Ct. 2634, 49 L.Ed.2d 379 (1976)).
In reference to the statement given Clore, the appellant's counsel learned of the statement a month prior to trial and thus had ample opportunity to use the statement in any way that they felt would be of value to the appellant. While the statement was exculpatory in the sense that it denied involvement in the crime, it was inculpatory in that it asserted an alibi that the state was able to attack and discredit. As we have previously stated, the untimely disclosed statement was duplicative of the previous statement given Marshall, which had been timely disclosed. All the information in the statement given Clore was contained in the statement given Marshall. We fail to see how the belated disclosure of the Clore statement prejudiced the appellant in any way. We also do not believe the tardy disclosure raised a Brady violation. For a Brady violation to occur, there must be a reasonable probability, one sufficient to undermine confidence in the outcome, that the jury would have resolved the appellant's case differently had the state disclosed the statement on a timely basis. We cannot reach such a conclusion. The untimely disclosure could not have had any effect whatsoever on the outcome of the case.
In reference to the statements made by the child witness and his father to the police shortly after the crime was committed, the appellant's counsel clearly had access to the father's statement and a police summary of the child's statement more than three months before the trial, and they had actual knowledge of the information for a month and one-half before the trial. This was ample time for them to explore and make effective use of the information and to cure any prejudice caused by delayed disclosure. Not only did they have access to the information, they interviewed the child and his father prior to trial, examined the psychologist's report on the child, subpoenaed them as witnesses, and had them called as witnesses at the trial. Under these facts, we cannot find that the appellant was prejudiced by the late disclosure of the evidence, either in his trial preparation or in his defense. We find no merit in the appellant's argument that, had the information been disclosed earlier, it would have enabled more effective preparation for trial. Such an argument could always be made, whether the evidence was exculpatory or inculpatory. In determining the defendant's right to due process and a fair trial, "the proper focus is upon the materiality in the nondisclosure or delayed disclosure of exculpatory information." Ex parte Raines, 429 So.2d at 1113. We conclude that there is no reasonable possibility that the outcome of the trial would have been different had these witnesses' information been disclosed earlier; under these circumstances, we cannot say that the state's tardy disclosure undermines our confidence in the jury's verdict.
The appellant's decision to place the child and his father on the witness stand was a calculated risk. The fact that it backfired cannot reasonably be attributed to the tardiness in receiving the initial information. As it turned out, the testimony of the child and his father was inculpatory. A defendant has no Brady claim where he fails to show that withheld evidence was favorable to the defense. Thompson v. State, 581 So.2d 1216 (Ala.Cr.App.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).
For the above reasons, we find no due process violation under Brady.

VI-C.
The appellant contends that the trial court erred in denying his motion for a mistrial after the state elicited alleged inadmissible character evidence concerning possible collateral offenses from prosecution witness Braden. The record shows the following:
"A. Okay. When we met at the north side of the mobile home there I asked [the appellant], I said `Bob, did you do it?' ... He said `yes, I did it.'

*981 "Q. Did he say anything else?
"A. And I asked him why.
"Q. What did he say?
"A. He said, um, that he was robbing her, she came home before he expected her to, she had too much on him and he said `I had to shoot the bitch.'
"Q. What, if anything, did you say after that?
"A. I asked him why, if he knew the difference in the time involved if he were caught for robbery than compared to what he would have got for murder.
"Q. Did you also inquire to him about some burglaries?
"A. That's what I was inquiring about.
"MR. BECK [defense counsel]: Your Honor, we object to this.
"Q. All right, sir.... I'll withdraw that question. What, if anything, else did you ask him?
"A. Well, I can't hardly answer that without going
"Q. All right, sir. Tell us what you asked him.
"MR. BECK: Your Honor, now we object to this, and we've already had a conference outside in your chambers on this and you ruled it out. Extraneous matters.
"MR. BECHER: Judge, I don't know what conference he's talking about. Maybe we should approach the bench and find out."
The trial court subsequently sustained the appellant's objection to the prosecutor's asking Braden if he had asked the appellant about "some burglaries"; however, the court overruled the appellant's subsequent motion for a mistrial sought on the same grounds. The appellant did not ask for curative instructions, nor did he move to exclude the question and/or Braden's answer. "[A] mistrial should be granted only when a `high degree of "manifest necessity" is demonstrated.' " Cole v. State, 548 So.2d 1093 (Ala.Cr. App.1989) (quoting Wadsworth v. State, 439 So.2d 790, 792 (Ala.Cr.App.1983), cert. denied, 466 U.S. 930, 104 S.Ct. 1716, 80 L.Ed.2d 188 (1984)). We find no such degree of manifest necessity here. Whether to grant a mistrial is within the discretion of the trial court, and we find no abuse of that discretion in this case. The reference to "burglaries" was vague and obscure. The only particular context the jury could have reasonably put it in is Braden's explanation of his inquiry to the appellant about the appellant's motivation to kill in light of the appellant's knowledge that a sentence for burglary and/or robbery, which he was in the process of committing when confronted by the victim, would be much less than a sentence for murder. We find the appellant's possible interpretation too tenuous to warrant the drastic measure of a mistrial. We are buttressed in our position by the fact that, if the jury did indeed consider the reference to possibly indicate any past criminal behavior, the reference was merely cumulative, for the jury was informed of the appellant's admissions in his statement to Marshall that although he had a criminal record, had served time, and would steal cars, he would certainly not commit murder.
Although we conclude that the trial court properly denied the appellant's motion for mistrial, we must also determine if the facts warranted any form of lesser relief.
"[W]hen a litigant makes a motion for a mistrial immediately after the question or questions are asked that are the grounds made the basis of the motion for the mistrial, and the grounds for the motion are clear and definite, then the motion for mistrial will preserve for review lesser prayers for relief, such as an objection or motion to strike."
Ex parte Marek, 556 So.2d 375, 379 (Ala. 1989). The trial court sustained the appellant's objection entered after Braden answered. We consider this to be sufficient. The trial court had no reason to exclude Braden's answer, because it appeared to equate the "burglaries" with the murder-burglary. Further, the trial court was wise in not instructing the jury to disregard the question and answer, for we feel that, under the circumstances, any instruction would have created an inference of past criminal behavior by the defendant. However, the trial court instructed the prosecutor not to *982 ask further questions about any other burglaries.

VII.
The appellant contends that the trial court erred by failing to give the jury "thorough" instructions on how it should treat bad character evidence when considering a witness's testimony. In this regard, the appellant makes reference to two of the state's witnesses: Headley, the victim's boyfriend, and Braden, a key state witness who testified that the appellant admitted committing the crime. In his defense, the appellant presented witnesses who testified that Braden had a bad general reputation and a bad general reputation for truth and veracity, and that Headley had a bad general reputation as well as a bad general reputation for violence and aggressiveness. The record shows that the appellant submitted the following written requested charge 20 concerning how bad character evidence of a witness should be treated: "If the evidence convinces you that a witness is of bad character and unworthy of belief, you may disregard his evidence altogether."
While there appears to be a slight discrepancy between that portion of the court's oral charge giving charge 20, as reported in the record, and the written requested instruction, the appellant concedes in his brief and in the record that the trial court included this requested instruction in its oral charge to the jury. The trial court charged, in part, as follows:
"As members of the jury it's your duty to place a construction upon the evidence which makes all witnesses speak the truth if that can be done. All conflicting evidence should be reconciled if possible, but if it cannot be reconciled you may base your verdict on the part of the testimony which you consider worthy of credit and reject that which you deem unworthy of credit.
"Where there is conflicting evidence presented by the prosecution and the defense it is for you members of the jury to resolve that conflict and to determine the defendant's guilt or innocence. You may believe or disbelieve all or any part of the testimony presented by either side.
"If the evidence convinces you that a witness is a bad [sic] or unworthy of belief you may disregard his testimony altogether, or you can accept that part which you believe to be true and disregard that part which you believe to be false."
Upon conclusion of the trial court's oral charge, the appellant orally asked for additional instructions on the treatment of the bad character evidence concerning Braden and Headley and urged the court to define bad character and advise the jury of what it should do with the character evidence and how it should use the evidence in making credibility decisions. The trial court did not give additional instructions concerning character evidence.
"A trial court has broad discretion in formulating its jury instructions, providing they are an accurate reflection of the law and facts of the case." Coon v. State, 494 So.2d 184, 186 (Ala.Cr.App.1986) (citations omitted). "The refusal to give a requested charge on the effect of evidence of bad character requires a reversal where there is evidence of bad character and the charge is not covered in substance by the trial court's oral charge." Wright v. State, 494 So.2d 726, 732 (Ala.Cr.App.1985), aff'd, 494 So.2d 745 (Ala. 1986), cert. denied, 479 U.S. 1101, 107 S.Ct. 1331, 94 L.Ed.2d 183 (1987) (citation omitted). A trial court's oral charge must be construed as a whole. Kennedy v. State, 472 So.2d 1092 (Ala.Cr.App.1984), aff'd, 472 So.2d 1106 (Ala.1985).
After reviewing the trial court's oral charge in its entirety, we are of the opinion that the court did not commit error in not extending its character instructions as requested by the appellant. We note that the appellant's request for additional instructions was not specific, not in writing, and was couched in the most general language. It appears from the record that the trial court may have been reluctant to extend the charge as requested because of the danger of commenting on the evidence and invading the province of the jury. While a more detailed and emphatic instruction may have been desirable, we think the trial court's instructions were adequate. Moreover, in regard to the character evidence of Headley's *983 general reputation for violence and aggression, we find additional reason to uphold the trial court's denial of the request for further instruction. Although the trial court afforded the appellant considerable range in developing his theory that Headley committed the crime by allowing him to attempt to show that Headley had a motive, the opportunity to kill the victim, and a reputation for being violent and aggressive, the trial court would not have erred had it sustained objection to the testimony of Headley's bad general reputation for violence and aggressiveness.
Although it is generally held that a defendant, in attempting to disprove his own guilt, may prove that another person committed the crime for which the defendant is being tried, C. Gamble, McElroy's Alabama Evidence § 48.01(1) (4th ed. 1991), he can introduce only evidence that would be admissible under normal evidentiary rules, Green v. State, 258 Ala. 471, 64 So.2d 84 (1953). Some of these rules are as follows: An accused can only introduce evidence of another's guilt when the evidence against the accused is circumstantial, C. Gamble, supra, at § 48.01(1); he "`cannot prove the character of another in the community where he lives for the purpose of showing that such other, and not the accused, committed the crime being prosecuted,'" McAdams v. State, 378 So.2d 1197 (Ala.Cr.App.1979) (quoting C. Gamble, McElroy's Alabama Evidence § 48.01(10) (3d ed. 1977)); and the motive of another to commit the crime for which the accused is being tried, without more, is generally not admissible, C. Gamble, supra, at § 48.01(7). When considering these rules, we find that the trial court, in allowing the appellant to pursue this defense in this manner, went far beyond what it was legally required to do. The case against the appellant was not entirely circumstantial, considering his confession and the child's identification and observations. Because the evidence of Headley's character of violence and aggressiveness was gratuitously admitted, we fail to see how the appellant was harmed by the court's failure to further instruct the jury on how to treat this evidence.

VIII.
In section III of the appellant's supplemental brief, the appellant contends that his pretrial incarceration of 22 months with no provision made for bail was a denial of due process requiring reversal of his case. There is no merit in this contention. A defendant charged with a capital offense may be held without bail "when the proof is evident or the presumption great," Ala. Const. Art. I, § 16; Ex parte Bynum, 294 Ala. 78, 312 So.2d 52 (1975); Coral v. State, 551 So.2d 1181 (Ala.Cr.App.1989); Spinkle v. State, 368 So.2d 554 (Ala.Cr.App.1978), writ quashed, 368 So.2d 565 (1979); Ala.Code § 15-13-3 (1975).

IX.
In section V of the supplemental brief, the appellant contends that the trial court erred in denying his motion for individual voir dire of the prospective jurors on their knowledge of the case. We have disposed of this issue in part V-B of this opinion. However, in his supplemental brief the appellant contends that, in the light of the extensive publicity immediately prior to trial, the procedure mandated by the trial court for conducting voir dire denied him the ability to conduct meaningful voir dire on the potential jurors' knowledge of the case, and constituted reversible error. We do not agree. There is no evidence in the record of extensive pretrial publicity. Moreover, when the trial court asked the venirepersons if any of them knew anything or had heard anything about the case, no one responded. In addition, a fair reading of the record discloses that the trial court did not rule out individual voir dire of the prospective jurors. Instead, it expressly stated that the appellant's motion for individual voir dire was denied except as to "certain type matters" that would be taken up when and if necessary. The appellant did not seek to question the venire about any knowledge of the case gained from any pretrial publicity.

X.
In section IX of the appellant's supplemental brief, the appellant contends that the trial court's jury instructions, in the guilt *984 and penalty phases, defining reasonable doubt were constitutionally deficient. He relies on Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), to support his contention. In the instant case, unlike in Cage, no objection was made below to the instructions now complained of; therefore, this issue is reviewable only under the plain error doctrine, Rule 45A, A.R.App.P.
In Cage the Court found that a jury instruction that defined "reasonable doubt" by using a combination of the phrases "grave uncertainty," "actual substantial doubt," and "moral certainty" could have led a reasonable juror to interpret the instructions to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause. In reviewing the instant reasonable doubt instruction in the context in which it was given in the charge as a whole, we do not find that it contains the same flaw condemned by the Court in Cage. The trial court in the instant case used the phrases "moral certainty" and "actual and substantial doubt" in defining reasonable doubt, but did not use the phrase "grave uncertainty," which was used in Cage. The cases are clearly distinguishable. Obviously, it was not the use of any one of the terms used in Cage, but rather the combination of all three that rendered the charge in Cage unconstitutional. See Gaskins v. McKellar, ___ U.S. ___, ___, 111 S.Ct. 2277, 2297, 114 L.Ed.2d 728 (1991) (wherein, in a memorandum opinion, Justice Stevens stated that he thought that the Court correctly decided not to grant certiorari on the question of whether Cage announced a new rule, because the jury instructions to be reviewed did not contain the specific language condemned in Cage that a reasonable doubt "must be a doubt as would give rise to a grave uncertainty"). For a discussion of Cage and its application to instructions similar to the instant instruction, see Ex parte Beavers, 598 So.2d 1320 (Ala. 1992); Smith v. State, 588 So.2d 561 (Ala.Cr. App.1991), and cases cited therein.
We conclude that the definition of reasonable doubt given the jury in the instant case correctly conveyed the concept of reasonable doubt, was not misleading or confusing, and was not constitutionally deficient. There is no error here, much less plain error.

XI.
In section X of the appellant's supplemental brief, the appellant contends that his constitutional rights were violated by the presence of a relative of the victim at the prosecution table throughout the trial. He relies on Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989).[1] He raised no objection to this during the trial and, therefore, we must review this claim under the plain error rule. Under the Alabama Crime Victims' Court Attendance Act, §§ 15-14-50 through -57, Code of Alabama 1975, the victim of a criminal offense or representative of the victim's family has a right to be present in the courtroom and to be seated alongside the prosecutor during the trial of the individual charged with that offense. This act is applicable to both capital and noncapital cases. Henderson v. State, 583 So.2d 276 (Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992), and cases cited therein. Booth v. Maryland and South Carolina v. Gathers are not applicable here. We find no merit in this contention.

XII.
In section XI of the appellant's supplemental brief, the appellant claims that there was a substantial probability that the trial court's jury instructions could have been interpreted by a reasonable juror to require unanimous agreement of the jury on the existence of particular mitigating circumstances. He relies on Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), which holds that under the then-existing particular Maryland capital sentence scheme as applied to that defendant, there was a substantial probability that the jurors erroneously *985 thought that they were precluded from considering any mitigating evidence unless they unanimously agreed on the existence of particular mitigating circumstances. The Court, in remanding the case for resentencing, stated that the sentencer must be permitted to consider all mitigating evidence and that a scheme that would allow one juror to block such consideration was unacceptable.
Mills v. Maryland is distinguishable from the instant case. Unlike the Alabama sentencing scheme, Maryland's practice required the jury to complete a verdict form that could have been construed to require unanimous agreement before a mitigating circumstance could have been found to exist. The Alabama Supreme Court addressed this identical issue in Ex parte Martin, 548 So.2d 496, 499 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989), holding that under the instructions given in Martin, "the jurors could not have reasonably believed that they were required to agree unanimously on the existence of any particular mitigating factor." The instructions given in Martin are substantially the same as those given in the instant case. The jury instructions in both cases were in accordance with the Alabama Pattern Jury Instructions: Criminal and with § 13A-5-45(g), Code of Alabama 1975. The juries in both cases were instructed that the defendant had the burden of injecting an issue of mitigating circumstance, but that once it was injected, the state had the burden of disproving the existence of any mitigating circumstance by a preponderance of the evidence; there were no instructions suggesting that mitigating circumstances had to be by unanimous finding. See also Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, ___ U.S. ___, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). The jurors in the instant case could not have reasonably believed that they were required to agree unanimously on the existence of any particular mitigating factor. The appellant did not object to the trial court's instructions on mitigating circumstances, and, thus, we review this issue under the plain error rule. We find no error here, much less plain error. Moreover, we note that, even had the charge been ambiguous, the appellant would not have been harmed, because the jury recommended a sentence of life imprisonment without parole.

XIII.
The appellant contends that various comments made by the prosecutor during closing arguments at the guilt and sentencing phases constituted reversible error.
"During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference." Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Cr.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). "In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits," Hooks v. State, 534 So.2d 329, 354 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991). "In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury." Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). "To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted." Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr.App.1985) (citations omitted).
First, the appellant contends that the prosecutor improperly argued during the guilt phase that the state's version of the facts was true. Our examination leads us to conclude that this argument was not improper, but was a fair comment on the evidence. It could not be fairly characterized as the prosecutor's personal opinion of the evidence and of the credibility of the state's witnesses, *986 as the appellant contends. It was a fair comment on the believability of the witnesses and a plea to the jury to seek the truth.
The appellant's contention that the prosecutor improperly argued during the guilt-phase closing argument that evidence existed that the state was not allowed to present but that would demonstrate the appellant's guilt is not factually supported by the record. We find no merit in the appellant's contention that the prosecutor's argument that the defense was attempting to "dupe" the jury was improper. The argument apparently referred to by the appellant was a fair comment on the evidence and on the theory of the defense. The comment that a particular state witness was deserving of belief was a reference to the qualifications of a firearms expert, was fully justified by the evidence, and was not improper.
The appellant's contention that the prosecutor argued in the sentencing phase that the appellant's failure to testify in his own behalf should be weighed in favor of the death penalty is not factually supported by the record. The appellant contends that the following portion of the prosecutor's argument in the sentencing phase also constituted an improper comment on the appellant's right to remain silent:
"You know on September 18th and since then he has made many people cry. I have not heard, as was suggested by Mr. Travis [defense counsel] in his opening statement, the reason for this crime. You're gonna get to know this man and maybe understand why it was committed. I don't understand it."
We do not view this argument as a comment on the appellant's failure to testify or a comment that his failure to testify should be weighed against him in determining sentence. Considered along with the entire argument and in proper context, it was directed at the failure of the defense to produce any evidence in mitigation of the crime, not at the failure of the appellant to testify. The prosecution has a right to comment on the failure of the defense to counter or explain the evidence. Ex parte Wilson, 571 So.2d 1251 (Ala.1990).
The appellant's contention that the prosecutor's closing penalty phase argument violated the holding in Booth v. Maryland is without merit.
Our review of the prosecutor's comments, in conjunction with the entire argument and the evidence in this case, convinces us that the comments were not improper. The appellant further contends that a review of the prosecutor's closing arguments, in their entirety, mandates a reversal because of the cumulative effect of alleged numerous instances of allegedly improper remarks. We do not agree. We find no error in the arguments of the prosecutor during either the guilt or sentencing phases of the trial. Finally, we note that particularly in regard to the questioned comments in the sentencing phase arguments, even if the propriety of a comment was questionable, no prejudice resulted, because the jury recommended a sentence of life without parole. See Hooks, 534 So.2d at 358.

XIV.
The appellant contends in section XIV of his supplemental brief that his constitutional rights were violated by the trial court's failure to qualify prospective jurors as to whether they had a fixed opinion in favor of capital punishment. He contends that the trial court on voir dire questioned prospective jurors as to whether they were opposed to capital punishment, but did not question them as to whether they believed that persons found guilty of a capital offense should be sentenced to death.
Contrary to the appellant's contention, we find that the trial court did propound such questions to the venire. The court asked the prospective jurors the following:
"Is there anyone, before hearing anything about the case, that does not feel you would be able to consider both alternative sentences and listen with an open mind to any aggravating or mitigating circumstances, but you feel like regardless of what the facts are or the aggravation or mitigation that may be introduced, do you honestly feel that if the defendant were convicted that you would be more likely or predisposed to return a death verdict? Is *987 there anyone who has that feeling before the case has even begun?"
In our opinion, the above question was sufficient to determine if any member of the venire had a fixed opinion in favor of a death sentence, and was sufficient to meet the requirements of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).
Further, even if the question were insufficient, the appellant was not prejudiced, because the jury recommended a sentence of life imprisonment without parole. See Neelley v. State, 494 So.2d 669 (Ala.Cr.App.1985), aff'd., 494 So.2d 697 (Ala.1986), cert. denied, 480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702 (1987), and cases cited therein.

XV.
In section XVI of the appellant's supplemental brief, the appellant claims that the following jury instruction on intent shifted the burden of proof on the intent element, in violation of Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979):
"The defendant commits the crime of murder of the intentional killing-type if with the intent to cause the death of another person he causes the death of that person, and a person acts intentionally with respect to a result or to conduct when his purpose is to cause that result or to engage in that conduct."
This instruction in unlike the instruction condemned in Sandstrom. Contrary to the appellant's claim, the instruction does not shift the burden of proof on the element of intent to the appellant, nor does it advise the jury that a person intends the natural and probable consequences of his acts, as the Sandstrom instruction did. The instruction was proper and follows the Alabama Pattern Jury Instructions: Criminal. Because the appellant did not object to this instruction, we have reviewed this claim under the plain error rule, and we find no error.

XVI.
On original submission, we found that the trial court's sentencing order failed to comply with the requirements of §§ 13A-5-47(d) and (e). It contained no findings, and without findings we were unable to review the sentencing decision. We remanded the case to the trial court on May 31, 1991, with instructions that it enter specific written findings concerning the existence or nonexistence of the aggravating and mitigating circumstances, enter written findings of facts summarizing the crime and the appellant's participation in it, and, once again, decide the appropriate punishment by reweighing the proper aggravating circumstances against any proper mitigating circumstances. On August 12, 1991, the trial court filed its return to our remand, consisting of a new sentencing order dated August 6, 1991, purporting to comply with §§ 13A-5-47 through -52.
The appellant, by supplemental brief, contends that the trial court's second sentencing order fails to comply with the appropriate sentencing statutes, particularly § 13A-5-47(d), and with our instructions on remand, and urges us to remand the case again for the entry of a proper sentencing order. The appellant correctly argues that the new sentencing order does not reflect what, if any, mitigating circumstance the trial court found, nor does it reflect what evidence was considered by the trial court in determining the existence or nonexistence of any mitigating circumstance. The appellant further correctly argues that the new sentencing order is so deficient that this court will be unable to review the trial court's sentencing decision. We once again find it necessary to remand this case for the entry of a proper sentencing order.
We again call the trial court's attention to § 13A-5-47(d), which, inter alia, requires the trial court to enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, any additional mitigating circumstance offered pursuant to § 13A-5-52, and summarizing the facts surrounding the crime and the appellant's participation in it. Section 13A-5-47(e) requires the trial court to weigh the aggravating and mitigating circumstances and to consider the advisory sentence recommended by the jury. *988 The findings of the trial court should reflect a thorough compliance with these provisions.
We urge the trial court to be cautious if it chooses to adopt portions of its most recent sentencing order because that order contains obvious mistakes, i.e., the finding that the jury found the appellant guilty of the capital offense charged in Count I of the indictment, and guilty of murder charged in Count II, when the exact opposite was true.
Because at this juncture we have no proper sentencing order before us, we pretermit decision on the appellant's additional issues contesting his death sentence. We remand this case to the trial court with directions that the court enter a new sentencing order in accordance with our instructions and, once again, decide the appropriate punishment by reweighing the proper aggravating circumstances against the proper mitigating circumstances and by considering the jury's recommendation. On this remand, the trial court shall also vacate the appellant's conviction for murder under Count I, as we have directed in Part I of this opinion. The trial court shall take all directed action in sufficient time to permit the circuit clerk to make a proper return to this court at the earliest possible time within forty-five (45) days of the release of this opinion. The parties, of course, do not relinquish their respective positions regarding other issues raised on appeal that we have not addressed, and this court reserves comment on them until the trial court complies with the directions contained herein and until a proper return is made to this court.
REMANDED WITH DIRECTIONS.
All Judges concur.
NOTES
[1] Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), were overruled by Payne v. Tennessee, ___ U.S. ___, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).