The appellant, Joe Little, was convicted of two counts of murder, a violation of § 13A-6-2, Ala. *Page 540 
Code 1975, and one count of robbery, a violation of § 13A-8-41, Ala. Code 1975. He was sentenced to life imprisonment on each count; the sentences were to run concurrently.
Evidence presented at trial tended to show the following. On January 6, 1996, George Tawan Dean and Frederick Glover were drinking and listening to music. The two men talked about "making a lick," which, according to Dean's testimony, could mean committing a robbery, selling drugs, or "getting some money any way you can." At around 7:00 p.m. that evening, Dean and Glover met Little. The three men talked for a while and then walked to a nearby convenience store to purchase cigarettes and wine. At around 10:00 p.m., as the trio walked along Michigan Avenue, a man in a red pickup truck pulled alongside them and indicated that he was interested in buying drugs. One of the three directed the man to turn onto nearby Colgin Street and to wait for them. The three then walked to where the truck had stopped. Little opened the passenger door and got inside the truck, while Glover walked to the driver's side and stood outside the truck looking in at the driver and Little. Dean stood behind Glover, farther away from the truck. Dean testified that he heard some words being exchanged before a shot was fired. He did not see who fired the shot; all he saw was a "flash" inside the truck. Stephen Wyatt, the driver of the truck, was shot in the head. The bullet passed through Wyatt's head and exited through his neck and then struck Glover in the neck. The truck began to move down the street. As the truck moved down the street, Dean heard one or two more gunshots. The truck sideswiped a parked car and crashed into a tree stump. Little got out of the truck and stumbled into a nearby yard. He then went to see Elenora Hall, a friend of his who lived nearby. Hall took Little to a hospital emergency room. Dean left Glover lying in the street and ran to Limerick Street to get help. Meanwhile, several residents of nearby houses had called the police.
Melvin Parker, who lived at 1504 Colgin Street, testified that he was watching television on the evening of January 6 when he heard a loud noise outside. He went to his door and saw a black man staggering in his yard. He noticed that the man was wearing a black jacket with some writing on it. Parker went back inside and placed a "911" telephone call to the Mobile Police Department. When he returned to the door, the black man was gone.
Christi Hendrix, who lived at 1503 Colgin Street, testified that after she heard several gunshots on the evening of January 6, she looked outside to see what was happening. She saw a black man lying in the street, and told her sister to call the police. Hendrix went outside to where the man was lying and saw a gun next to him. In her opinion, the man was dead. She then walked over to where a red pickup truck had crashed into a tree stump. There was a white man in the driver's seat; he appeared to her to be near death. While Hendrix was outside, she saw several people drive up in a car, put the black man into the car, and drive away before the police arrived.
Mobile police officers investigating the incident discovered a Rossi .38 caliber revolver in Melvin Parker's yard. There were two full cartridges in the gun, two empty casings, and one empty chamber. Less than 100 feet from where the police found the revolver, they found a leaf with blood on it. The police discovered a Colt .38 caliber special in the street, next to a puddle of blood. The Colt was fully loaded, with six cartridges. The weapons were processed for latent fingerprints, but the results were inconclusive. Inside Wyatt's truck, the police noted damage to the dashboard on the passenger side of the truck and to the glove compartment, as well as bloodstains on the windshield above the damaged portion of the dashboard. They also found a bloody $20 bill and a marijuana cigarette butt on the driver's side of the truck. *Page 541 
Stephen Wyatt died as a result of two gunshot wounds to the head. One of the bullets that struck Wyatt passed through his neck and killed Frederick Glover when it struck Glover in the neck. Forensic testing established that the fatal shots were fired from a Rossi .38 caliber handgun. However, authorities were unable to positively determine whether the fatal shots were fired from the same Rossi .38 caliber revolver found in Melvin Parker's yard, because the bullets recovered from Wyatt's and Glover's bodies were damaged on impact.
Blood samples were collected from Little, Wyatt, and Glover, in an attempt to identify the various bloodstains found in Wyatt's truck, on Little's clothes, on the handguns, and on a leaf found near the Rossi revolver. DNA testing established that blood found on Little's jacket belonged to Wyatt. DNA testing also established that the blood on the leaf was Little's. However, DNA testing of bloodstains on the windshield of Wyatt's truck, as well as bloodstains on the guns, was inconclusive.
Mobile police officers took Little into custody at the hospital emergency room. They transported Little from the hospital emergency room to the Mobile police station, where he was questioned by Investigator Donald Pears. In his statement to Investigator Pears, which was admitted at trial, Little denied any involvement in the shooting. Little told Investigator Pears that he did not know anything about the shooting and that he had been "nowhere around any of this." Little stated that he was walking with Glover and Dean on the night of January 6, but that he stopped for a moment and that the other two walked on ahead. He stated that while he was standing alone, someone struck him from behind, causing him to lose consciousness. Little told Investigator Pears that when he regained consciousness, he made his way to Elenora Hall's house, and Hall took him to the hospital emergency room for treatment.
Little testified in his own behalf at trial. Contrary to his statement to Investigator Pears, Little admitted that he was, in fact, present during the shooting; however, he maintained that the shooting was an accident. Little also denied that he and his companions intended to rob Wyatt. Instead, he characterized the shooting as a "drug deal gone bad." Little testified that he got into Wyatt's truck to sell him a "dime bag" of marijuana and that Wyatt pulled a gun on him. According to Little, he and Wyatt then struggled over the gun, and the gun went off, shooting them both.
Police did not find a "dime bag" of marijuana inside Wyatt's truck, or on Little's person in the emergency room.
Little, who was 16 years old at the time of the offense, contends that the trial court erred by denying his motion to suppress his custodial statement to Investigator Pears. Specifically, he asserts that he was not informed before making the statement that he had a right to communicate with his parent or a guardian, as provided for in Rule 11(B)(4), Ala.R.Juv.P.
Rule 11(B), Ala.R.Juv.P., commonly referred to as the "juvenile Miranda[1]" or "SuperMiranda" rights, enumerates the rights of a child who is in custody but who has not yet been questioned. It provides as follows:
 "Before the child is questioned about anything concerning the charge on which the child was arrested, the person asking the questions must inform the child of the following rights:
"(1) That the child has the right to counsel;
 "(2) That if the child is unable to pay a lawyer and if the child's parents or guardian have not provided a lawyer, one can be provided; *Page 542 
 "(3) That the child is not required to say anything and that anything the child says may be used against the child;
 "(4) That if the child's counsel, parent, or guardian is not present, then the child has a right to communicate with them, and that, if necessary, reasonable means will be provided for the child to do so."
The state acknowledges that Little was not advised of his "juvenile Miranda" rights as set out in Rule 11(B), but it argues that the trial court correctly determined that Little was not entitled to the protections afforded by Rule 11(B) because he was being investigated for a Class A felony and, under § 12-15-34.1, Ala. Code 1975, he was not subject to the jurisdiction of the juvenile court but was to be charged, arrested, and tried as an adult.[2]
This issue has been resolved in our recent decisions in Anderson v. State, [Ms. CR-95-0768, May 8, 1998] 729 So.2d 900
(Ala.Cr.App. 1998), and Young v. State, [Ms. CR-95-2195, October 2, 1998] 730 So.2d 1251 (Ala.Cr.App. 1998). In Anderson, this court held:
 "We find nothing in the language of § 12-15-34.1 to support the state's contention that the rights granted a child pursuant to Rule 11(B) are extinguished by the fact that a child alleged to have committed an offense enumerated in that statute `shall be charged, arrested, and tried as an adult' and automatically subjected to the jurisdiction of the adult system. While § 12-15-34.1 clearly modifies the jurisdiction of the juvenile court and divests a child accused of committing a serious offense of the right to a transfer hearing in the juvenile court, it does not modify the statutory definition of the term `child' and does not, by its terms, divest the child of the protections afforded by Rule 11(B). If the legislature, when enacting § 12-15-34.1, had intended to exclude from the statutory definition of `child' juveniles 16 years of age or older at the time of committing an offense enumerated in the statute, we may presume that it would have done so. It did not.
 "The terms `charged, arrested, and tried' as used in § 12-15-34.1 cannot feasibly be viewed as synonyms for `questioned.'"
729 So.2d at 903-04 (citations omitted). "If the Legislature had wanted children to be `interrogated' as adults, it could have included the word `interrogated' immediately before the words `charged, arrested, and tried as an adult' [in § 12-15-34.1]." Young, 730 So.2d at 1254. We adopt our rationale in Anderson and Young in holding that Little's custodial statement was wrongfully admitted in evidence because Little was not informed that he had a right to communicate with his parent or guardian as provided in Rule 11(B)(4), Ala.R.Juv.P.
However, a finding of error does not necessarily require that Little's convictions be reversed. Just as we did in Anderson and Young, we must determine whether the receipt into evidence of Little's statement constituted harmless error. Coral v. State,628 So.2d 954, 973 (Ala.Cr.App. 1992), aff'd, 628 So.2d 1004 (Ala. 1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61
(1994). "`In order for a constitutional error to be deemed harmless under Chapman [v. California, 386 U.S. 18, 87 S.Ct. 824,17 L.Ed.2d 705 (1967)], the state must prove beyond a reasonable *Page 543 
doubt that the error did not contribute to the verdict. In order for the error to be deemed harmless under Rule 45, [Ala.R.App.P.,] the state must establish that the error did not injuriously affect the appellant's substantial rights.' Coral, 628 So.2d at 973." Anderson, 729 So.2d at 904.
During its case-in-chief, the state offered Little's statement in which he denied any involvement in the shooting. The prosecution then offered DNA evidence conclusively connecting Little to the scene of the shooting and, thus, discrediting Little's statement. In an attempt to explain the inconsistencies between his statement to Investigator Pears and his trial testimony, Little testified that the reason he denied any involvement in the shooting was that he did not want to tell Investigator Pears that he was involved in a drug transaction at the time of the shooting. Little also explained that he did not recall what had happened on the night in question until sometime after his interview with Investigator Pears. Furthermore, he testified that what really happened that night came to him "in a dream."
Although Little's custodial statement, standing alone, was not incriminating, it was highly inconsistent with his testimony at trial. By offering during its case-in-chief DNA evidence establishing Little's presence at the shooting, and also offering Little's statement denying all involvement with the shooting, the state left Little with no choice but to take the stand and to attempt to explain his previous statement. The state, during its cross-examination of Little, used his prior statement to cast doubt on the credibility of his trial testimony. Little's explanations regarding these inconsistencies added little to his credibility. Particularly troubling was Little's explanation that the version of events he testified to at trial came to him in a dream sometime after his interview with Investigator Pears. In addition, during its closing argument, the state effectively used the conflicts between Little's statement and his trial testimony, arguing that Little had changed his story for trial — after DNA evidence conclusively discredited his earlier version of events. Although we cannot say that the jury accepted the state's interpretation of Little's statement in this regard, we also cannot say with any certainty that the jury could not have found the state's argument to be persuasive.
Accordingly, we are unable to say that the error in admitting Little's custodial statement into evidence at his trial was harmless beyond a reasonable doubt. Therefore, the judgment in this case is reversed, and the cause is remanded to the trial court for proceedings consistent with this opinion.
REVERSED AND REMANDED.
Cobb and Baschab, JJ., concur; Brown, J., dissents with opinion; McMillan, J., joins dissent.
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966).
[2] Section 12-15-34.1, Ala. Code 1975, provides, in pertinent part:
 "(a) Notwithstanding any other provision of law, any person who has attained the age of 16 years at the time of the conduct charged, which if committed by an adult would constitute any of the following, shall not be subject to the jurisdiction of juvenile court but shall be charged, arrested, and tried as an adult:
"(1) A capital offense.
"(2) A Class A felony.
 "(3) A felony which has an element thereof the use of a deadly weapon.
 "(4) A felony which has an element thereof the causing of death or serious physical injury."